**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARILYN JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 16 cv 144 |
| | ) | |
| v. | ) | |
| | ) | District Judge Robert W. Gettleman |
| THOMAS DART, et al., | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

The Court hereby recommends that Plaintiff's Motion for an Order Striking Certain Opinions of Defendants' Experts [dkt. 216] and Defendants' Motion to Bar Opinions of Dr. Peter Madill and Nurse Jacqueline Moore Pursuant to *Daubert* [dkts. 218, 219] be granted in part and denied in part as discussed below. Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy. Unless the district judge orders otherwise, the objecting party must promptly arrange for transcribing the record, or whatever portions of it the parties agree to or the magistrate judge considers sufficient. All matters relating to the referral of this action are resolved; case returned to the assigned judge. Referral terminated.

## I.    BACKGROUND

### A.    Factual Background

This case is a death action that arises under the Civil Rights Act of 1871 (42 U.S.C. §1983), brought by Marilyn Johnson ("Plaintiff") on behalf of the estate of Norman Johnson ("Johnson"). On January 3, 2014, Johnson was arrested by the Chicago Police Department and charged with possession of 0.2 grams of a controlled substance. (Dkt. 188 at ¶ 12.) Prior to his arrest, Johnson was

participating in a methadone program and taking prescription Xanax. (Dkt. 218-5 at 5.) His last dose of methadone before his arrest was 125 milligrams at 6:28 a.m. on January 3, 2014; it is unclear when he last took Xanax before his arrest. (Dkt. 218-5 at 6.) Johnson was unable to make bond and was transported to the Cook County Jail on January 4, 2014. (Dkt. 188 at ¶¶ 15, 17.) Shortly after midnight on January 5, 2014, Johnson began intake medical screening with the team of Cermak Health Services employees at Cook County Jail. (Dkt. 188 at ¶¶ 19-23.) Johnson was first seen by Kim Blackstone, RN, who recorded Johnson's vital signs and noted that Johnson's medications prior to arrest were Xanax, methadone, clonidine, and Flomax. (Dkt. 218-5 at 7.) Johnson next saw Paramedic Andrew Crowley; Johnson told Crowley he had occasionally used crack cocaine, had been hospitalized four times for mental health concerns, he was nauseous and might soon vomit, and he was enrolled in a methadone program. (Dkt. 218-5 at 7-8.)

At approximately 2:00 a.m. on January 5, 2014, Dr. Sunita Williamson completed the intake for Johnson, noting that he had been taking Xanax and methadone, and prescribing several medications for nausea, vomiting, diarrhea, abdominal cramping, and anxiety on an as-needed basis. (Dkt. 218-5 at 8.)

At the time of Johnson's incarceration, Cook County Jail had a protocol for opioid dependent detainees who reported methadone dependence. When a newly admitted inmate informed the intake screeners that he was in an Opioid Treatment Program ("OTP") prior to arrest, the intake screener would complete a blue methadone referral card and route it to a pharmacy technician through a dedicated communication box. (Dkt. 216-7 at 12.) The pharmacy staff would then contact the detainee's OTP to verify participation and dosage, and, assuming that the OTP verified the detainee's participation, he or she would be enrolled in the Substance Abuse and Methadone Management System. (Dkt. 216-2 at 19, §1.j.ii) Medical providers at the jail would then begin safely tapering the detainee's methadone. (Dkt. 216-2 at 19, §1.j.iii.) Blackstone testified that she had no recollection

of interacting with Johnson, but it was her practice to fill out the methadone referral card for any detainee who reported participation in an OTP. (Dkt. 216-7 at 12-13.) All parties agree there is no methadone referral card in Johnson's medical file from the Cook County Jail, and that he was never prescribed methadone during his time at the Cook County Jail.

Presumably based on his answers at intake, Johnson was referred for a mental health assessment. (Dkt. 218-5 at 8.) At 6:33 a.m., a licensed clinical professional counselor named Ventsislava Valchanski treated Johnson. (*Id*.) Johnson told Valchanski that he felt restless and depressed and that he "needs [his] meds." (*Id*.) According to Valchanski's notes, Johnson stated he was taking 2 milligrams of Xanax daily prior to his arrest. (*Id*.) Valchanski entered a recommendation for Johnson to see a psychiatrist, and an order referring Johnson to a psychiatrist was signed by Cook County Jail Chief Psychologist Kenya Key. (Dkt. 218-5 at 8-9.) However, Dr. Key stated she never saw Johnson or his medical records, and that the order was signed on her behalf by a subordinate. (Dkt. 218-5 at 9.)

Johnson attended a mental health group meeting the morning of January 5, 2014; his behavior was noted as being appropriate. (Dkt. 216-2 at 13.) In the early afternoon of January 6, Johnson appeared at the nursing station in his housing unit. Nurse Markitha Bolden took Johnson's vital signs, but the medical record provides no other information. (Dkt. 216-2 at 14.) Although it is unclear why Johnson presented to the nurse's station that afternoon, there is no dispute Johnson was never prescribed or distributed methadone or Xanax while he was at Cook Country Jail.

At 10:09 a.m. on January 7, 2014, Correctional Officer Lakisha Palomino was alerted by Correctional Officer Percy Kirkwood that Johnson was having a seizure.[1] (Dkt. 218-5 at 10.) At approximately the same time, Correctional Officer Walter Lewis arrived on the scene and

---

[1]    It is unclear whether Johnson's medical episode can be medically described as a seizure; however, at the time of the emergency, all of the correctional officers and medical staff treated it as a seizure, and the Court will use that term here for simplicity.

3

repositioned Johnson onto his side. (Dkt. 218-5 at 11.) He did not initiate CPR. (*Id.*) The record contains conflicting reports about whether Lewis detected a pulse on Johnson in that initial encounter. (Dkt. 216-11 at 11 (Lewis claims he found a "faint pulse"); Dkt. 216-7 at 10 (Lewis "was unable to find a pulse")). Several inmates housed in the dormitory with Johnson report that Lewis refused to perform CPR on Johnson and Lewis said that he only performed CPR on women and children. (Dkt. 218-5 at 11.)

One minute later, Nurse Uveeda Cade arrived, found faint radial pulses, and left to get her stethoscope. (Dkt. 218-5 at 11.) Meanwhile, Palomino informed her shift commander, Lieutenant Navarette, of the situation at 10:12 a.m. (Dkt. 218-5 at 12.) Nurse Cade's actions over the next thirty minutes are subject to conflicting reports and testimony. Generally, Plaintiff contends that Nurse Cade failed to perform CPR on Johnson, despite having no pulse; left Johnson while he was unresponsive to continue distributing medications to other inmates; and stated that "all we can do is wait" until the paramedics arrive. (Dkt. 218-8 at 8.) Nurse Cade maintains she only left for approximately 30 seconds to get her stethoscope, and that Johnson registered a pulse at all times until the EMTs arrived at approximately 10:16 a.m., at which point the paramedics initiated CPR and applied an automatic external defibrillator ("AED"). (Dkt. 216-11 at 8-9.) Lieutenant Navarette appeared in Johnson's cell at 10:36 a.m. with a second AED. (Dkt. 218-5 at 12.) At 10:40 a.m., Chicago Fire EMS arrived. (*Id.*) A Cook County Fire Department ambulance arrived at 10:46 a.m. and left at 11:04 a.m. to transfer Johnson to the Emergency Room at St. Anthony's Hospital, where he was pronounced dead at 11:27 a.m. (*Id.*) Medical Examiner Dr. Ponni Arunkumar, M.D. issued a Report of Postmortem Examination for Johnson. (Dkt. 218-1.) Dr. Arunkumar opined that Johnson died of methadone toxicity. A toxicology report prepared by Peter J. Koln, Pd.D., found that Johnson was positive for benzodiazepines,[2] benzoylecgonine, and methadone; Johnson's peripheral blood

---

[2] Benzodiazepines are a class of drug that includes Xanax.

measured methadone in the amount of 0.74 micrograms/ml. (Dkt. 218-1 at 7-8.)

### B.    Defendants' Expert Reports

#### 1.    Dr. David Mathis, M.D.

Dr. David Mathis, M.D. is a medical doctor currently licensed to practice in California, who has taken and passed the National Commission on Correctional Health Care ("NCCHC") examination to become a Certified Correctional Healthcare Professional. (Dkt. 216-2 at 3.) In 2015, Dr. Mathis passed a "more specialized physician examination" to become a Certified Correctional Healthcare Professional Physician. (*Id.*) Dr. Mathis has a long history of working as a doctor in correctional settings. From 1981-1991, he worked for the Virginia Department of Corrections treating innates in a road camp. (Dkt. 216-2 at 3-4.) In 2006, he was hired as the medical director at Eastern Correctional Institution ("ECI"), which is a 3,500-inmate facility in Maryland. (Dkt. 216-2 at 4.) As medical director, Dr. Mathis assisted with ECI's accreditation with the American Correctional Association. (*Id.*) After his contract with ECI expired, Dr. Mathis was employed as a physician for the California Medical Facility, which provides medical and psychiatric care for 2,500 inmates. (Dkt. 216-2 at 5.) Dr. Mathis is still employed at the California Medical Facility.

After reviewing the materials Defendants' counsel provided, Dr. Mathis issued the following opinions: 1) Cermak Health Services used an opioid treatment program that identified and treated methadone and other drug withdrawal at Cook County Jail that met the standard of care for such programs; 2) Valchanski and Dr. Key complied with the standard of care as mental health providers; 3) Cermak Health Services pharmacy personnel had no duty to provide Johnson methadone unless it was ordered by Cermak Health Services physicians; 4) Johnson died as a result of methadone toxicity and obtained contraband methadone in the dormitory where he resided; 5) the correctional officers (Palonmino, Lewis, Kirkwood, and Navarette) provided appropriate care during Johnson's medical emergency; 6) the root cause analysis completed by Cermak Health Services after Johnson's death

exceeded the standard of care in 2014. (Dkt. 216-2.)

Plaintiff moved to strike portions of Dr. Mathis's opinions. (Dkt. 216.) Plaintiff's motion seeks to bar the following: 1) the conclusion that Johnson died of methadone toxicity; 2) the opinion that Johnson obtained contraband methadone; 3) Mathis's "opinion based on prejudicial and irrelevant negative occurrences in Johnson's remote past," such as his prior psychiatric hospitalizations; 4) Mathis's opinion that the opioid treatment program at Cook County Jail met the standard of care; 5) the conclusion that the mental health professionals met the standard of care; 6) the assertion that the pharmacy workers met the standard of care; 7) Mathis's opinion that benzodiazepine withdrawal was not considered serious in 2014; 8) Mathis's opinion that the timing of initiating CPR might be delayed due to security concerns in a correctional setting; and 9) the conclusion that cardiac conditions predisposed Johnson to sudden death. (Dkt. 216 at 3-4.)

### 2. Kimberley Pearson, R.N.

Kimberley Pearson is a registered nurse currently licensed to practice in California and has worked as a nurse and administrator for over 35 years. (Dkt. 216-7 at 1.) Currently employed as an independent consultant, Ms. Pearson spent 2010-2019 in various nursing administration positions in the County of Orange (California) Health Care Agency correctional program including as the Deputy Agency Director for Correctional Health Services. (Dkt. 216-7 at 1-2.) Ms. Pearson's report opines that: 1) Defendants met the standard of care regarding access to healthcare, as described in NCCHC Standards for Health Services in Jail J-A-01; 2) Defendants met the standard of care for screening, NCCHC Standards for Health Services in Jail J-E-02 and 4-ALDF-4C-22; 3) Defendants met the standard of care for treating intoxication and withdrawal, as described NCCHC Standards for Health Services in Jail J-G-07; 4) Defendants met the standard of care for emergency services, as described in NCCHC Standards for Health Services in Jail J-E-08; 5) Defendants met the standard of care for providing written policies and procedures, as described in NCCHC Standards for Health Services in

Jail J-A-05 and the American Correctional Association's Performance-Based Standards for Adult Local Detention Facilities, § 4-ALDF-7D06. (Dkt. 216-7.)

Plaintiff has moved to bar portions of Ms. Pearson's report on the following bases: 1) any opinion regarding Cade should be excluded, because Pearson was not disclosed as an expert for Cade; 2) Ms. Pearson's opinion regarding Blackstone, Crowley, and Bolden meeting the standard of care are not supported by the facts of the case; and 3) Pearson's recitation of Johnson's medical background consisted of medical judgments that are factually incorrect and irrelevant. (Dkt. 216 at 17.)

### 3. Maureen Nally, R.N.

Maureen Nally, R.N., was hired as an expert witness to offer a report and testify on behalf of Defendant Cade. Ms. Nally has worked in a variety of clinical capacities as a registered nurse since 1975, and has supplemented her clinical work by serving as a "legal nurse consultant." (Dkt. 216-11 at 1-2.) After reviewing the materials supplied by Cade's attorney, Ms. Nally issued a report with the following opinions: 1) Cade complied with the nursing standard of care in caring for Johnson; 2) Cade's treatment of Johnson's seizure complied with the standard of care and treatment protocols outlined in the Cook County Emergency Protocol, the Epilepsy Foundation, the American Heart Association, and the Centers for Disease Control; 3) Cade's decision to leave Johnson for a period of time must be considered in the context of "an open area in the jail with multiple detainees;" 4) Ms. Moore's opinion (discussed below) that Cade's conduct was "egregious" is "unfair and without merit;" 5) Ms. Moore's opinion (discussed below) that Cade was deliberately indifferent is "inaccurate and unfounded;" 6) Dr. Madill's opinion (discussed below) that Cade was deliberately indifferent is "without merit;" 7) Dr. Madill's "criticism" (discussed below) that Cade did not review Johnson's history "demonstrates a surprising lack of understanding as relates to the work a day circumstances of nurses in a non-acute setting and is without merit." In the fourth opinion referenced

above, Ms. Nally remarked that Johnson's pupillary dilation/constriction suggested that he had gone into cardiac arrest around the time that Cade returned to Johnson and the EMTs began to treat him. (Dkt. 216-11.)

Plaintiff moved to bar the following portions of Ms. Nally's report: 1) her opinion that Cade acted within the standard of care for treating seizure victims; 2) Ms. Nally's opinion regarding the significance of Johnson's pupillary response vis-à-vis the timing of his cardiac arrest; 3) Ms. Nally's citation of a "prolonged QT segment" on a 2012 Electrocardiogram of Johnson; 4) Ms. Nally's discussion of Johnson's medical history, family relationships, and psychiatric history. (Dkt. 216 at 22-23.)

## C. Plaintiff's Expert Reports

### 1. Dr. Peter Madill, M.D.

Dr. Madill has been licensed to practice medicine in California since 1977, and has actively practiced from that time to present. (Dkt. 218-5 at 2.) Beginning in 1989, Dr. Madill has practiced addiction medicine in California after undergoing training with the American Society of Addiction Medicine, and has engaged in continuing medical education courses through that organization. (*Id.*) As part of his addiction medicine practice, Dr. Madill has diagnosed and treated many opioid dependent patients in hospitals and residential treatment centers, and has managed their detoxification programs. (Dkt. 218-5 at 3-4.) Dr. Madill also reports that in the early part of the 2000s, he "developed a further sub practice of designing and implementing detoxification protocols for individuals wanting to cease their use of benzodiazepines." (Dkt. 218-5 at 3.)

After reviewing the materials provided by Plaintiff's attorneys, Dr. Madill issued the following opinions: 1) Johnson's death was caused by complications from a seizure resulting from the abrupt cessation of his prescriptions for methadone and Xanax; 2) the abrupt cessation of methadone and Xanax caused Johnson to "experience gratuitous and agonizing pain and suffering"

before his death; 3) failure by Crowley, Blackstone, Bolden, and Williamson to adequately evaluate Johnson for methadone and Xanax withdrawal and to provide him with a methadone referral card put him at risk for unnecessary pain, suffering, and death; 4) Dr. Williamson's failure to prescribe methadone and Xanax "was a failure to exercise medical judgment and below the minimum standard of care and the cause of [Johnson's] suffering, seizure and death;" 5) Dr. Key and Valchanski's failure to properly evaluate Johnson's mental health "was a direct cause of his suffering and death;" 6) Lewis, Kirkwood, Palomino, Cade, and Navarette failed to promptly and properly respond to Johnson's medical emergency, which "constituted deliberate indifference and a failure of medical and correctional judgment that diminished [Johnson's] chance of survival;" 7) the Cook County Jail Methadone Maintenance Policy was deficient because it lacked "checks and balances" to ensure a new detainee received the methadone referral card, which caused Johnson's suffering and death; and 8) the Cook County Medical Examiner incorrectly attributed Johnson's death to methadone toxicity. (Dkt. 218-5.)

Defendants moved to bar Dr. Madill's opinions. Defendants argue that Dr. Madill lacks the skill, experience, and education to opine on Johnson's cause of death. (Dkt. 218 at 8) Additionally, Defendants contend that Dr. Madill cannot offer expert opinions against the nurses (Blackstone, Cade, and Bolden), Crawley (the paramedic), the mental health professionals (Dr. Key and Valchanski), or Dr. Williamson (an emergency room doctor) because he lacks the qualifications to render opinions on the actions of individuals in those professions. (Dkt. 218 at 14-22.) Finally, Defendants move to strike Dr. Madill's opinion that Cade had a duty to check Johnson's chart early in her shift, and her failure to do so was "another failure of medical judgment and a departure from the minimum standard of care." (Dkt. 218 at 15-16.)

### 2. Jacqueline Moore, R.N.

Jacqueline Moore, RN, Pd.D., CCHP-A, is a nurse consultant licensed to practice nursing in

Illinois and Colorado. (Dkt. 218-8 at 1.) She was the American Nurses Association representative to the Board of the NCCHC and has worked in correctional health care for over 35 years. (*Id*.) She has served as the Health Services Administrator for the Cook County Juvenile Detention Center. (*Id*.) Ms. Moore has also been on the Board of Directors for the American Correctional Health Service Association and the Board of Trustees of the NCCHC. (*Id*.) She has been involved with various committees and task forces responsible for drafting correctional health standards. (*Id*.)

After reviewing the materials provided by Plaintiff's attorneys, Ms. Moore issued the following opinions: 1) the intake screeners (Crowley, Valchanski, and Dr. Williamson)[3] did not follow the policies of Cermak Health System when they neglected to give Johnson a methadone referral card or order any treatment for Xanax withdrawal; 2) Defendants failed to ameliorate Johnson's withdrawal by providing adequate medications or assessing him with sufficient frequency; 3) Crowley, Blackstone, Valchanski, and Dr. Williamson did not meet the standard of care because they did not follow the procedures in place to treat inmates for methadone detoxification and did not appropriately manage Johnson's methadone and Xanax withdrawal, which were serious medical needs that could result in injury or death; 4) Cade's actions "were egregious in responding to this patient" because she reportedly left Johnson while he was unresponsive and did not begin CPR until a paramedic told her to do so; 5) the lack of initiating CPR by Cade or any of the correctional officers "created harm and contributed to the death of Mr. Johnson;" and 6) the actions of Cade and Lewis show "a pattern of deliberate indifference." Ms. Moore's last opinion is based on disputed facts that suggest that Lewis refused to perform CPR on Johnson because Lewis stated he did not perform CPR on men, and Cade's statement that "all we can do is wait" for the paramedics to arrive. (Dkt. 218-8.)

Defendants moved to bar Ms. Moore's opinions on two bases. First, they claim Ms. Moore's opinion that the medical examiner's report is inaccurate with regard to cause of death should be

---

[3] Blackstone is not included in this opinion of Ms. Moore for reasons that are not immediately clear to the Court.

barred. (Dkt. 218 at 8-9.) Next, Defendants argue Ms. Moore lacks the skill, experience, training, or education to offer expert opinions as to Dr. Williamson and Valchanski. (Dkt. 218 at 23-24.)

## II.    LEGAL STANDARD

The admission of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"Under the *Daubert* framework, the district court is tasked with determining whether a given expert is qualified to testify in the case in question and whether his testimony is scientifically reliable." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). "'Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.'" *Id.* (quoting *Carroll v. Otis Elevator Co*., 896 F.2d 210, 212 (7th Cir.1990)). The reliability of the expert turns on the three criteria codified in Rule 702 (*i.e.*, the testimony is based on sufficient facts or data, the testimony is the product of reliable principles and methods, and those methods have been reliably applied). The trial court is the gatekeeper of expert testimony, but must focus on the "'soundness and care with which the expert arrived at her opinion,'" not whether the opinion itself is correct. *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015) (quoting *Schultz v. Akzo Nobel Paints, LLC,* 721 F.3d 426, 431 (7th Cir. 2013)).

## III.   DISCUSSION

### A.    Testimony Regarding Johnson's Social and Medical History

As discussed below, Plaintiff attempts to bar Defendants' experts from testifying regarding

Johnson's past drug use and psychiatric history, arguing that it is irrelevant and prejudicial. To be certain, all Defendants' expert reports contain long recitations of Johnson's history, much of which may be prejudicial and none of which appears necessary to support any of Defendants' experts' conclusions. The Court believes there is a valid argument that these portions of the expert reports and testimony around them may be inadmissible at trial. However, arguments to that effect are best left to the trial judge in a *motion in limine* seeking to bar trial testimony. The question before the Court is whether the expert reports satisfy the requirement of Federal Rule of Evidence 702. In this Report and Recommendation, the Court rejects all Plaintiff's arguments regarding the relevance of Defendants' expert report because they are not appropriate arguments for a *Daubert* motion, but nothing in this opinion should be viewed as a recommendation regarding the ultimate admissibility of those portions of the reports.

### B.   Dr. Mathis

#### 1.   Dr. Mathis is Not Qualified to Opine on the Cause of Death

Dr. Mathis is not qualified to opine that methadone toxicity caused Johnson's death because he lacks the requisite knowledge or experience to render his opinion admissible. This case is similar to *Hall v. Flannery*, 840 F.3d 922 (7th Cir. 2016). In *Hall*, the decedent had surgery as a teenager to repair the fracture site and brain membrane where a cyst had formed from a skull fracture she had suffered as an infant. *Id.* at 924. She was discharged from the hospital one day later and found dead in her bed three days later. *Id.* at 925. The forensic pathologist who performed the autopsy could not identify a cause of death, so he consulted with a neuropathologist, who examined the decedent's brain and determined she "had died from a seizure brought about by the surgical damage." *Id.*

The decedent's estate sued the surgeons and the hospital; the defendants retained three expert witnesses, including a pediatric neurologist who opined that the "death was not brought about by a seizure, and opined that 'focal interstitial chronic inflammation' of Decedent's heart (*i.e.*, thickening

of the heart's connective tissue) was the likely cause of death." *Id.* The district judge admitted the expert testimony over the plaintiff's objection, and plaintiff appealed, arguing the expert lacked the qualifications to provide the aforementioned opinions. *Id.* at 927-28. The Seventh Circuit upheld the district court's decision to admit the expert's opinion that seizure was not the cause of death, reasoning that the expert's 25 years of experience as a pediatric neurosurgeon, performance of surgery on growing skull fractures like the decedent's, and publication of articles on cranial cysts qualified him to render an opinion on that topic. *Id.* at 928. The appeals court specifically rejected the argument that the expert needed to be a pathologist to render the opinion because "the issue of whether a seizure occurred shortly before [the decedent's] death did not concern knowledge that is held solely by pathologists." *Id.* at 929 (citing *Gayton v. McCoy*, 593 F.3d 610, 617, 618 (7th Cir. 2010) ("[o]rdinarily, courts impose no requirement that an expert be a specialist in a given field")). However, the Seventh Circuit held the expert lacked the necessary qualifications to opine that the heart condition was the likely cause of death. *Id.* at 929-30. The court went on to explain:

> Neither [the] trial testimony nor [the] expert report and *curriculum vitae* indicate that he possesses any specialized education, knowledge, experience, or skill concerning focal interstitial chronic inflammation specifically, or more broadly cardiology. Indeed, Dr. Ruge acknowledged at trial that when he read the inflammation finding in Weekley's autopsy report, he "didn't know what that was exactly." So he conducted a Google search and found several papers explaining that it is "a finding in young athletes who die suddenly of cardiac arrhythmias," even though their "hearts can look very normal." Based on this research, he opined that focal interstitial chronic inflammation "makes more sense [as a cause of death] based on the whole story, the whole picture." We do not doubt that Dr. Ruge is an intelligent doctor who possesses considerable knowledge about surgery, pediatrics, and neurology. However, the record lacks sufficient evidence demonstrating that this knowledge and the related experiences render Dr. Ruge qualified to opine about Weekley's heart.

*Id.* at 930.

The Court believes that, like the expert in *Hall*, Dr. Mathis is not qualified to opine that methadone toxicity was the cause of death for Johnson. This is not because Dr. Mathis is not a pathologist or lacks credentialing or specialization of any sort; however, there is no indication in the

record that Dr. Mathis has any experience with methadone toxicity levels in his practice of medicine, and he testified that he had to look up information about methadone toxicity levels to reach his conclusion and relied on one article to do so. Dr. Mathis's qualifications to opine on methadone toxicity as the cause of death are similar to those of the expert in *Hall*, which the Seventh Circuit rejected. Ultimately, Dr. Mathis's opinion regarding the cause of death does nothing more than recite the medical examiner's findings, and does nothing the help the jury determine the cause of death or explain anything in the medical examiner's report. *See Dura Automotive Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("The *Daubert* test must be applied with due regard for the specialization of modern science. A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science.").

Defendants argue that Dr. Mathis is not merely parroting the medical examiner's report, and is instead "relying on the raw data in the report (*i.e.*, Mr. Johnson's .74 level of methadone) as well as the medical literature to support his opinion that Mr. Johnson's death was a result of methadone toxicity." (Dkt. 227 at 8.) That description does not persuade the Court that Dr. Mathis is a qualified expert on this matter. By that explanation, anyone with access to the medical examiner's report and an internet search engine would be qualified as an expert on methadone toxicity as a cause of death, simply by seeing the recorded level of methadone in Johnson's blood and searching for toxicity levels in the publicly available medical literature. By Defendant's accounting, that is the same level of expertise Dr. Mathis has in this area. Because Dr. Mathis is not qualified to opine as an expert on this subject, the Court recommends Plaintiff's motion be granted to the extent it seeks to strike Dr. Mathis's opinion that Johnson died of methadone toxicity.[4]

###    2.    Dr. Mathis's Opinion that Johnson Obtained Contraband Methadone is Not Reliable and Should Be Stricken

---

[4]    The sections the report the Court finds inadmissible are in the Opinion Section of Dr. Mathis's report at the following sections: §§4.a, 4.a.ii.

Dr. Mathis's opinion that Johnson obtained contraband methadone is based on speculation, and is not based on sufficient facts or data or reliable principles and methods. "The whole point of *Daubert* is that experts can't 'speculate.' They need analytically sound bases for their opinions." *DePaepe v. General Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998). "To satisfy the requirements of Rule 702 and *Daubert*, the expert need[s] to show that his conclusions were the fruit of a rigorous, objectively-verifiable approach – something more than mere speculation." *Timmy v. Goodyear Dunlop Tires of North Am., Ltd.*, 932 F.3d 986, 994 (7th Cir. 2019).

To reach his conclusion that Johnson obtained contraband methadone in jail, Dr. Mathis reviewed the amount of methadone recorded in the medical examiner's report, then stated that "based on [his] experience in corrections, inmates like Johnson can obtain methadone" by having another inmate spit out liquid methadone, regurgitate ingested methadone, or give over contraband tablets. (Dkt. 216-2 at 22). That is the entirety of Dr. Mathis's basis for his opinion. Dr. Mathis does not point to any evidence Johnson received contraband methadone in any of those manners. He does not reveal the form of methadone inmates at Cook County Jail were prescribed or whether any of those contraband methods of transfer were feasible at Cook County Jail. More troublingly, Dr. Mathis does not discuss how he can be certain the amount of methadone in Johnson's autopsy was not from his last dose of prescribed methadone before his arrest; he does not mention Johnson's previous dose or the rate of metabolization of methadone in the body. This entire portion of the Mathis's report is unreliable speculation that should not be admitted, and the Court recommends it be stricken.[5]

### 3. Dr. Mathis is Qualified to Testify About the Standard of Care for Health Workers in the Correctional Setting

Plaintiff has argued that Dr. Mathis is not qualified to opine that the Cook County Jail OTP met the standard of care and that the mental health providers and pharmacist acted within the standard

---

[5]    The sections the report the Court finds inadmissible are in the Opinion Section of Dr. Mathis's report at the following sections: §§4.a.iii, 4.b.1-3; 4.c.i.2, 4.d.i-iv.

of care. Plaintiff's argument is a bit hard to parse; it seems to conflate issues of qualification and reliability. The only argument regarding qualifications centers around the fact that Dr. Mathis is not board certified in addictions medicine. But as the *Hall* court noted, that is not necessary. Dr. Mathis has worked in the correctional setting for years treating many inmates who are struggling with addictions issues. Even if he is not credentialed in the way that Plaintiff would prefer, there is no doubt Dr. Mathis has the experience to discuss the standard of care for health workers and OTPs in the correctional setting.

Instead, Plaintiff's argument seems to center on the reliability of Dr. Mathis's opinions. These arguments do not adequately attack the reliability of Dr. Mathis's report, and are best suited as fodder for cross-examination at trial. For example, Plaintiff contends that Mathis's opinion is based on "cherry-pick[ed]" data and that specific health care workers at Cook County Jail failed to meet the standard of care.[6] Those arguments are not about the reliability of Dr. Mathis's opinions; they are arguments about the persuasive value of those opinions. Such arguments are not a valid basis to strike an expert opinion. *See Chaudhry v. Provident Life Accident Ins. Co.*, 2015 WL 1756832, at *3 (N.D. Ill. Apr. 15, 2015) (arguments relating to accuracy of opinions or choices regarding underlying data "are inappropriate for a *Daubert* motion as they go to the weight of [the] testimony rather than its admissibility.") As such, the Court recommends that the arguments Plaintiff makes in Sections IV-VI of Plaintiff's motion should be rejected.

### 4. Dr. Mathis May Testify About Johnson's History

Next, Plaintiff posits that Dr. Mathis's opinion should be excluded to the extent it relies on "prejudicial and wholly irrelevant facts from Norman Johnson's medical history over a 30-year period." (Dkt. 216 at 8.) Once again, this is an argument that goes to persuasiveness and relevance,

---

[6] Plaintiff's reliance on *Davis v. Carter*, 452 F.3d 686 (7th Cir. 2006) is misplaced. That case reviewed a district court's decision on a summary judgment motion and does not elucidate any of the arguments being made in the *Daubert* motion currently before the Court.

not reliability. It is best suited for a motion *in limine* pursuant to Federal Rule of Evidence 403, not a *Daubert* motion. The Court recommends that Plaintiff's motion be denied as to Section III.

### 5. Dr. Mathis May Testify About Benzodiazepine Withdrawal Treatment in 2014

Although it does not appear in his report, Dr. Mathis testified, when questioned by Plaintiff's counsel, that he believed "the majority of people who stop benzodiazepine abruptly don't have serious complications including seizures," but it would depend on the amount of medication the person had been taking before cessation and co-morbidities. (Dkt. 216-3 at 10:7-17.) Dr. Mathis testified he was aware of "plenty of literature" to support that opinion. He further testified that the understanding of the seriousness of benzodiazepine withdrawal has "expanded exponentially" in the years following Johnson's death, but was not considered a serious medical condition in 2014. (Dkt. 216-3 at 101:4-15.) Plaintiff moves to strike that opinion as "underdeveloped and speculative."

The Court rejects that argument because this opinion is sufficiently reliable, and Dr. Mathis is qualified to opine on the matter. Dr. Mathis has years of experience treating inmates for withdrawal symptoms, including benzodiazepine withdrawal. He has the necessary experience and skill to testify on the issue. Also, he testified he was aware of a significant body of literature that supports his opinion. Between his experience treating benzodiazepine withdrawal cases and applying that experience and his review of the medial literature on the subject to the matter, Dr. Mathis has issued a reliable opinion that can be presented to a jury. To the extent the opinion is underdeveloped, it is because it was not included in Dr. Mathis's report, and Dr. Mathis only offered this opinion after being questioned on the issue of benzodiazepine withdrawal by Plaintiff's counsel. It is unclear why Plaintiff's counsel pressed Dr. Mathis for additional expert opinions that were not in his report. If Plaintiff sought to avoid supposedly underdeveloped opinions from Dr. Mathis, asking for his opinions on matters outside his report seems like a reckless way to achieve that goal. To the Court's view, the opinion is sufficiently reliable, and Plaintiff can attack it with cross-examination if Plaintiff

17

believes the opinion is unfounded, unpersuasive, or incorrect. The Court recommends that the argument presented in Section VII of Plaintiff's motion be denied.

### 6. Dr. Mathis is Not Qualified to Testify Regarding the Need to Delay CPR in a Correctional Setting

In his report, Dr. Mathis wrote that an expert without experience treating inmates in an emergency "has no sensitivity for the stress involved directly affecting cognition and performance," and that an emergency in an inmate dormitory "is confusing, fear-inducing, and far different than a hospital situation." (Dkt. 216-2 at 27, §§ 5.e, 5.f.) At his deposition, he further expounded that a correctional officer did not have a duty to immediately begin CPR on a person who is not breathing and has no pulse, because there might be overriding security concerns for the correctional officer. (Dkt. 216-3 at 52:15-23.)

Although Dr. Mathis has worked in the correctional setting as a doctor, there is no indication he is qualified through skill or experience to testify about the security issues facing correctional officers or nurses in emergency situations. In fact, Dr. Mathis testified at his deposition that he "would defer to a security expert" on when a situation was considered sufficiently secure to begin CPR. (Dkt. 216-3 at 60:14-61:1.) Given that Dr. Mathis himself acknowledged his lack of qualifications on this issue, the Court recommends that Plaintiff's motion be granted as to Section VIII.[7]

### 7. Dr. Mathis is Qualified to Testify Regarding Johnson's Heart Conditions

At his deposition, Dr. Mathis stated that the 90% right coronary artery occlusion found by the medical examiner rendered Johnson predisposed "to sudden death under any circumstances." (Dkt. 216-3 at 84:7-14.) Plaintiff moves to exclude this opinion based on Dr. Mathis's qualifications. The Court does not believe this opinion should be excluded.

---

[7]    The sections of the report that the Court finds inadmissible are in the Opinion Section of Dr. Mathis's report at the following sections: §§5.e, 5.f.

Unlike the opinion regarding methadone toxicity, the opinion being rendered by Dr. Mathis regarding coronary heart disease is not one that is outside the experience or knowledge of a family medicine practitioner with experience in the correctional setting. Dr. Mathis has likely treated many patients with heart disease, and is aware of the potential complications that come with significant coronary artery blockage. As such, the Court believes that Dr. Mathis is qualified to render this opinion and that Section IX of Plaintiff's motion should be denied.

### C.    Nurse Nally

#### 1.    Nurse Nally Can Testify that Cade Acted Within the Standard of Care

Plaintiff's argument that Nurse Nally cannot testify that Cade acted within the standard of care is scattered and appears to center on Nurse Nally's assumption that Johnson was having a seizure. This portion of Plaintiff's motion makes arguments about the soundness of Nurse Nally's opinion and the veracity of the facts she relied on. Once again, those arguments go the weight assigned to the expert opinions, not their admissibility. Plaintiff's brief does not contain a cognizable argument that Nurse Nally's is unqualified to render an opinion about the standard of care. As for reliability, Nurse Nally consulted seizure protocols promulgated by the Epilepsy Foundation, the American Heart Association, and the Centers for Disease Control, and determined that Cade's actions were within those protocols. This is a reliable method for reaching her opinion, and the Court recommends that Nurse Nally's opinion on this issue be admitted.

#### 2.    Nurse Nally is Not Qualified to Opine on the Significance of Pupillary Response or Prolonged QT Segments.

In her expert report, Nurse Nally opined that pupillary dilation/constriction suggested that Johnson had gone into cardiac arrest around the time that Cade returned to Johnson and the EMTs started CPR. To reach that opinion, Nurse Nally researched several articles on the issue of pupillary constriction as it relates to cardiac arrest. However, at her deposition the following colloquy occurred:

Q: Wouldn't you agree that the issue of pupil constriction and death is outside

your area of expertise?

A: Oh, absolutely, sir. That's why I did the research.

(Dkt. 216-12 at 122:2-6.)

Similarly, Nurse Nally wrote in her report that a prolonged QT segment in Johnson's July 2012 EKG was "one of the possible signs of a toxic methadone reaction." (Dkt. 216-11 at 6.) At her deposition, Nurse Nally admitted she had no special training that would qualify her to read and interpret an EKG. (Dkt. 216-12 at 24:10-21.)

By her own admission, Nurse Nally lacked the education and experience regarding pupillary response or QT segments to qualify as an expert on those issues. Being willing or able to research a condition you have no professional experience, education, or skill treating or diagnosing is not sufficient to qualify Nurse Nally as an expert on the matter. To be clear, the Court does not believe that citing other providers' findings on these issues is problematic, but Nurse Nally does not have the qualifications to draw conclusions from these findings as an expert witness. Because she lacks the qualifications to opine about pupillary response or QT segments, the Court recommends that Nurse Nally's conclusions on this matter be stricken.[8]

### 3. Ms. Nally May Testify Regarding Johnson's History

Finally, Plaintiff seeks to exclude opinions that are based on Johnson's familial, medical, and social history. As above, these types of arguments are truly about relevance and prejudice, not admissibility of expert testimony. This argument is best suited for a motion *in limine* pursuant to Federal Rule of Evidence 403, not a *Daubert* motion. The Court recommends Plaintiff's motion be denied on this issue.

### D. Nurse Pearson

---

[8]  The sections of Nurse Nally's report the Court finds inadmissible are: 1) the clause "on of the possible signs of a toxic methadone reaction" on page 6 (Dkt. 216-11 at 6); and 2) the second and third paragraphs on page 15 (Dkt. 216-11 at 15.).

### 1. Nurse Pearson May Testify Regarding Standard of Care

The section of Plaintiff's brief devoted to attacking Nurse Pearson's opinion on the standard of care is an argument about the underlying facts masquerading as a *Daubert* challenge and should be rejected. Plaintiff discusses the reason she disagrees with Nurse Pearson's opinions, which can be summed up as: "there are two diametrically different versions of events at play with respect to Nurse Cade's response to Norman Johnson's emergency," and "Nurse Pearson only considered the version of events that was most supportive of her opinion."[9] (Dkt. 216 at 19.) The remainder of Plaintiff's motion likewise focuses on factual disagreements about the actions of other Cook County Jail medical providers. These contentions, if true, are fertile ground for cross-examination of Nurse Pearson to demonstrate to the jury why her opinion should not be given significant persuasive weight, but is not a valid argument on a *Daubert* motion. The Court recommends Plaintiff's motion be denied on this issue.

### 2. Nurse Pearson May Testify About Johnson's Background

Once again, Plaintiff argues that an expert's recitation of Johnson's background is grounds to exclude that expert's opinion. The Court will not belabor the point, having rejected this argument several times already in this Report and Recommendation, but such arguments are not a good reason to bar expert testimony. The Court recommends that Plaintiff's motion be denied as to this argument.

### E. Dr. Madill

### 1. Dr. Madill is Not Qualified to Opine on the Cause of Death

Dr. Madill has opined that Johnson's death was caused by a seizure resulting from abrupt cessation of benzodiazepine (namely, Xanax) and methadone, and that the medical examiner's report

---

[9]   The Court rejects Plaintiff's objection that Nurse Pearson cannot offer opinions about Cade's actions because she was not disclosed as an expert for Cade. Cade's actions affect the liability of Cook County, for whom Nurse Pearson has been disclosed and, therefore, opinions regarding the propriety of Cade's actions may be included in Nurse Pearson's report.

was wrong. The Court recommends that these two opinions be deemed inadmissible because Dr. Madill lacks the expert qualifications to reach those conclusions and the methods he used to reach his opinion about the medical examiner's report are unreliable.

Dr. Madill has many years of experience as a physician treating patients in the addictions field. He certainly has significant knowledge in how to treat people suffering from addiction to drugs and alcohol and how to make sure they are safely detoxed from those drugs. However, none of this training gives him any specialized experience or skill in determining causes of death. The reasoning is similar to that articulated above with regards to Dr. Mathis. Dr. Madill's expert report and *curriculum vitae* do not indicate he possesses any specialized education, knowledge, experience, or skill concerning cause of death analysis from opiate or benzodiazepine withdrawal. The Court recommends that his opinion on that issue be stricken.

However, the Court's recommendation on this issue is a very narrow one. Although Dr. Madill is not qualified to specifically draw the conclusion that Johnson died from a seizure brought on by abrupt benzodiazepine and opioid cessation, he may testify to physiological effects of withdrawal on individuals who abruptly cease taking those classes of drugs. Having explained the medical complications inherent in benzodiazepine and opioid cessation to the jury, it will be Plaintiff's job to successfully prove that Johnson never received any opioids or benzodiazepines in the Cook County Jail and argue that Johnson did, in fact, die from the effects of his withdrawal.[10]

In addition, Dr. Madill's opinion that the medical examiner "was incorrect in attributing Norman Johnson's death to Methadone toxicity" should be stricken because it is unreliable. Nothing more clearly demonstrates the unreliable nature of this opinion than Dr. Madill's claim that "[w]hile the Cook County Medical Examiner autopsy report notes that Methadone and benzodiazepine were

---

[10]    To be clear, this is only an example of one of several ways Plaintiff may choose to prove her claims.

22

detected in Mr. Johnson's peripheral blood and that benzodiazepines were found in the urine, there was no effort to quantify their levels and I can only assume…they were there in only trace amounts." (Dkt. 218-5 at 32.)  This statement is demonstrably incorrect; the medical examiner's report clearly shows 0.74 micrograms per milliliter in Johnson's peripheral blood.  At his deposition, Dr. Madill was unaware of the amount of methadone found in Johnson's peripheral blood, per the medical examiner's report.  This demonstrates that Dr. Madill has not "reliably applied the principles and methods to the facts of the case," as required by Federal Rule of Evidence 702.  It is impossible for Dr. Madill to have done so when he was unaware of the most salient facts that would impact his conclusions at the time he issued his expert report or appeared for his deposition.  Dr. Madill cannot reliably claim that the medical examiner was incorrect without being aware of the basis of the medical examiner's decision on the cause of death.  Therefore, the Court recommends that this portion of Dr. Madill's report also be stricken.[11]

### 2. Dr. Madill is Qualified to Opine on the Medical Care Johnson Received at Cook County Jail

The remainder of Defendants' motion posits that Dr. Madill's opinions should be stricken because he is not qualified to offer expert opinions as to the medical care Johnson received at Cook County Jail.  The main thrust of Defendants' argument is that Dr. Madill is not qualified to render opinions regarding the appropriateness of care by Cook County Jail medical providers because he has very little experience practicing medicine in a correctional setting.  According to Defendants, Dr. Madill's lack of correctional experience renders him unqualified "to offer opinions in this case

---

[11] The sections of Dr. Madill's report the Court finds inadmissible are the following portions of Section 1 of the Opinion Section: 1) the first sentence; 2) the sentence starting "Norman Johnson's seizure and resulting respiratory arrest were completely preventable" from page 13 onto page 14; and 3) the sentence reading "dehydration and hypernatremia occurred in a brain that was already battered by the benzodiazepine withdrawal process" on page 17. The remainder of this opinion concerns the general physical response of individuals going through opioid or benzodiazepine withdrawal and is admissible. Furthermore, Section 8 of the Opinion Section of Dr. Madill's report should be stricken in its entirety as unreliable.

regarding and administering of Xanax for inmates such as Johnson." (Dkt. 218 at 13.)  The Court rejects this argument.  Dr. Madill has decades of experience as an addictions medicine specialist and has extensive skill and familiarity with both benzodiazepine prescription, administration, and safe detoxification.  There is no doubt Dr. Madill is qualified to testify regarding the standard of care for detoxification of both benzodiazepines and opioids.[12]

Defendants further argue that Dr. Madill should not be able to offer opinions on the actions of various Cook County Jail health care providers because he is a physician and they have different specialties (*i.e.*, nursing, paramedics, emergency room doctor, mental health care).  However, all the case law cited by Defendants consists of state law cases that do not have any bearing on a federal court's interpretation of the Federal Rules of Evidence, which codify the ruling of the United States Supreme Court in *Daubert*.  Defendants cite no federal court case law ruling that physicians are necessarily unqualified to offer opinions on other medical providers, and the Court believes any such arguments go more to the credibility and persuasiveness of Dr. Madill's opinions rather than admissibility.  *See, Gomez v. Palmer*, 2016 WL 212952, at *4 (N.D. Ill. Jan. 19, 2016) (allowing physician to offer expert opinions regarding actions of a nurse in a correctional setting).

There are several other stray arguments in Defendants' brief that the Court will briefly address. First, Defendants argue that Dr. Madill's opinions should be barred to the extent that they reach a "legal conclusion" that Cade was deliberately indifferent to Johnson.  The Court does not believe this is a basis to strike Dr. Madill's opinion.  Pursuant to Federal Rule of Evidence 704(a), "[a]n opinion is not objectionable just because it embraces an ultimate issue."  Next, Defendants seek to bar Dr.

---

[12]    Additionally, the Court is troubled by the implication in Defendants' argument. Benzodiazepines are metabolized the same way by human beings regardless of whether they are in a correctional setting or in the free world, and the risk of inappropriate detoxification procedures are likewise the same. The idea that there is something particular to prescribing and administering Xanax to inmates that is distinguishable from how one would do so with any other human being belies a dehumanization of those inmates. Any doctor with knowledge, skill, and experience regarding the treatment of individuals with benzodiazepines is qualified to testify regarding the treatment of inmates with those same drugs because there is nothing particular to inmates in correctional facilities that differentiates them from the free population in how they react to medications or medical treatment.

Madill's proposed testimony that Cade had a duty to review Johnson's chart prior to her first encounter with him because it is irrelevant. As above, the Court does not believe that relevance is a valid reason to exclude expert testimony at the *Daubert* stage. In short, the Court recommends that Dr. Madill's opinions regarding Cook County Jail medical staff's compliance with the relevant standards of care should be admitted.

####    F.    Nurse Moore

#####        1.    Nurse Moore is Not Qualified to Opine on the Cause of Death

At her deposition, Defendants' counsel asked Nurse Moore whether she agreed with the medical examiner's finding that Johnson died of methadone toxicity, and Nurse Moore testified that she did not agree with that finding. (Dkt. 223-2 at 85:9-22.) That opinion is nowhere in her report,[13] and the Court in unclear why Defendants' counsel elicited such testimony at the deposition. Nonetheless, Nurse Moore admitted at her deposition that she was not a medical expert and lacked the qualifications to testify about cause of death; therefore, to the extent that Nurse Moore is attempting to opine on cause of death, she lacks the qualifications to do so and any such opinion should be excluded.

#####        2.    Nurse Moore is Qualified to Opine on the Propriety
        of the Actions of Dr. Williamson and Valchanski

Finally, Defendants seek to bar Nurse Moore's opinions because she is not qualified to testify about the standards of care for Dr. Williamson (an emergency room doctor) and Valchanski (a mental health provider). As discussed in the background section, Nurse Moore has extensive experience working in the correctional medical sector and has been involved in the drafting of rules and regulations regarding correctional health standards. She clearly has the experience, skill, and knowledge to understand and articulate the relevant standards of care for various roles in a

---

[13]    Nurse Moore's report simply states "[t]he autopsy report indicated that the death was due to methadone toxicity," which is an anodyne recitation of a basic fact that probably did not require further investigation at her deposition.

correctional medicine setting.  Again, Defendants have not cited any federal case law holding that nurses are necessarily unqualified to testify under *Daubert* regarding the standard of care for medical professionals outside of their specific field.  While such arguments might successfully diminish the persuasive value of Nurse Moore's opinion to the jury, they are not a reason to bar her testimony or report.  The Court recommends Defndants' motion be denied as to this issue.

**CONCLUSION**

For the reasons discussed above, the Court recommends that Plaintiff's Motion for an Order Striking Certain Opinions of Defendants' Experts [dkt. 216] and Defendants' Motion to Bar Opinions of Dr. Peter Madill and Nurse Jacqueline Moore Pursuant to *Daubert* [dkts. 218, 219] be granted in part and denied in part.  Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  A party may respond to another party's objections within 14 days after being served with a copy.  Unless the district judge orders otherwise, the objecting party must promptly arrange for transcribing the record, or whatever portions of it the parties agree to or the magistrate judge considers sufficient.  All matters relating to the referral of this action are resolved; case returned to the assigned judge.  Referral terminated.

Entered: December 18, 2020

United States Magistrate Judge,
Susan E. Cox