IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARILYN JOHNSON, individually and as Administrator of the Estate of NORMAN JOHNSON, deceased,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>Cook County Sheriff THOMAS DART in his Official Capacity, *et al.*,<br><br>　　　　Defendants. | Case No. 16 C 0144<br><br>Judge Robert W. Gettleman<br><br>Magistrate Susan E. Cox |

**DEFENDANTS' RULE 72 OBJECTIONS TO CERTAIN PORTIONS OF THE ORDER ON PARTIES' *DAUBERT* MOTIONS**

Defendants Cook County, Sunita Williamson, M.D., Markitha Bolden, LPN, Kenya Key, PsyD, Ventsislava Valchanski, Nurse Uveeda Cade, Kim Blackstone, R.N., Andrew Crowley, Olufemi Ajala, Officer Walter Lewis, Lt. Sergio Navarette, Officer Lakesha Palomino, and Officer Percy Kirkwood by their respective attorneys, pursuant to Rule 72, object to the Magistrate Judge's order barring certain opinions of the Defendants' Experts (Dkt. No 238). In support, Defendants state the following:

**INTRODUCTION**

This lawsuit was brought by Marilyn Johnson, on behalf of the estate of Norman Johnson, who died after three days in custody in the Cook County Jail. Plaintiff's Second Amended Complaint remains pending against twelve individually named defendants as well as Cook County and asserts three claims: deliberate indifference[1] against the individual defendants (Count I), and

---

[1] While Plaintiff asserts "deliberate indifference," Defendants note that the applicable standard for medical care claims brought under the Fourteenth Amendment by pretrial detainees is objective unreasonableness. *See Miranda v. Cnty. of Lake*, 900 F.3d 335 (7th Cir. 2018).

1

two separate *Monell claims*, the first against Cook County Sheriff Dart (Count II), and a second against Cook County (Count III). The lawsuit offers two bases of liability against the defendants. First, plaintiff claims Cook County and numerous Cook County healthcare providers failed to provide Mr. Johnson with Xanax and methadone, despite plaintiff's request upon intake that he receive methadone pursuant to his participation in a methadone treatment program. (See, Second Amended Complaint, Dkt. No 188.) Second, plaintiff alleges Cook County correctional officers and medical providers failed to timely respond and provide care to Mr. Johnson at the time he suffered an emergency medical event in his dorm. (Dkt. No. 188). Plaintiff claims Mr. Johnson died from an abrupt withdrawal of methadone and benzodiazepines. Defendants have denied the allegations.

Defendants moved to bar certain opinions of Plaintiff's two experts, Dr. Peter Madill and Nurse Jacqueline Moore. (Dkt. No. 219). Plaintiff also moved to bar certain opinions of Defendants' experts, Dr. David Mathis, Nurse Kim Pearson and Nurse Maureen Nally. (Dkt. No. 216).

On December 18, 2020, the Magistrate Judge issued her Memorandum and Opinion on the parties' *Daubert* motions. (Dkt. No. 238). Defendants object herein to certain rulings contained within the Magistrate Judge's Memorandum. First, Defendants object to the Magistrate Judge's recommendation that Dr. Mathis be barred from offering cause of death opinions. Plaintiff alleges Mr. Johnson died of abrupt withdrawal from methadone and benzodiazepines, in direct contradiction to the Medical Examiner's Report, which found he died from methadone toxicity. Defendants' expert, Dr. Mathis, opined Mr. Johnson died from methadone toxicity based on the Medical Examiner's Report (including the toxicology report) and his experience and training in

2

treating with patients with methadone and benzodiazepine withdrawal (and overdose). As discussed in more detail below, this opinion satisfies *Daubert* and should not be barred.

Second, Defendants object to the Magistrate Judge's recommendation that Dr. Mathis be barred from testifying regarding Mr. Johnson's presentation of overdose (in refuting Plaintiff's theory that Mr. Johnson suffered from a withdrawal of methadone and benzodiazepines). The Magistrate Judge's order barred this opinion as part of a finding that Dr. Mathis' proposed testimony that Mr. Johnson obtained contraband Methadone was speculative. However, Dr. Mathis' opinion regarding Mr. Johnson's symptoms of overdose is based on the medical records and his experience, and is separate and distinct from the opinion regarding contraband. Dr. Mathis satisfies the *Daubert* requirements to offer an opinion regarding Mr. Johnson's presentation of an overdose while at Cook County Jail.

Third, Defendants object to the Magistrate Judge's recommendation that Nurse Moore be permitted to offer opinion testimony against defendant physician Dr. Williamson. Nurse Moore opines Dr. Williamson violated the standard of care for an emergency room physician in rendering care and treatment to Mr. Johnson. As a nurse, Moore lacks the experience and education to render an opinion regarding the care and treatment of a physician such as Dr. Williamson. By her own admission, Nurse Moore is not familiar with the medical judgment of an emergency room physician; accordingly, she should be barred from testifying against Dr. Williamson.

Lastly, Defendants object to the Magistrate Judge's recommendation that Nurse Nally be barred from offering opinions regarding the significance of Mr. Johnson's pupillary dilation. Nurse Nally disclosed her opinion that "[c]onstricted pupils would not have been present had Mr. Johnson laid unattended in arrest for an extended length of time," and that "[p]upil constriction supports records that indicate that Mr. Johnson arrested about the time Nurse Cade returned and EMTs

3

responded." (Dkt. No 216-11 at 15). This opinion relates directly to claims that Nurse Cade failed to timely administer CPR. As discussed in detail below, Nurse Nally should be permitted to testify as to her opinion on the significance of pupillary findings because the opinion is consistent with both *Daubert* and F.R.E. 702.

## **BACKGROUND**[2]

On January 3, 2014, Mr. Johnson was arrested by the Chicago Police Department and charged with possession of 0.2 grams of a controlled substance. (Dkt. No. 188 at ¶ 12). Prior to his arrest, Mr. Johnson was enrolled in a methadone maintenance program and was also prescribed Xanax. (Dkt. No. 219-5 at 5). His last dose of methadone before his arrest was 125 milligrams at 6:28 a.m. on January 3, 2014. (Dkt. No. 219-5 at 6). Mr. Johnson's last dose of Xanax prior to his arrest is unknown. *Id.* Shortly after midnight on January 5, 2014, Cook County Jail medical professionals began Mr. Johnson's intake medical screening. Mr. Johnson made the medical staff aware that he was in a methadone maintenance program. (Dkt. 219-5 at 7-8).

At the time of Mr. Johnson's incarceration, Cook County Jail had an Opioid Treatment Program ("OTP"). Under the OTP, if an arrestee stated he was in a methadone maintenance program, the intake screener would complete a methadone referral card and send it to the pharmacy, in order for the pharmacy to verify the information with the outside methadone program. (Dkt. No. 216-7 at 12). Based on the records, it is undisputed Mr. Johnson was never prescribed nor administered methadone by Cook County medical staff.

On the morning of January 7, 2014, Mr. Johnson suffered a medical episode while in his dormitory. (Dkt. No. 216-7 at 10). The Chicago Fire Department was notified and arrived on scene to transfer Mr. Johnson to St. Anthony's Hospital, where he was pronounced dead. (Dkt.

---

[2] While there are several other facts regarding liability and causation in this case, the background section of this brief focuses on facts pertinent to the issues of Defendants' Rule 72 objections.

No. 216-7 at 11). Medical Examiner Ponni Arunkumar, M.D., issued a Report of Postmortem Examination for Johnson. (Dkt. 219-1.) Dr. Arunkumar determined that Mr. Johnson died of methadone toxicity. A toxicology report prepared by Peter J. Koin, Pd.D., found that Mr. Johnson tested positive for benzodiazepines, benzoylecgonine, and methadone; Mr. Johnson's peripheral blood measured methadone in the amount of 0.74 micrograms/ml. (Dkt. 219-1 at 7-8.)

## LEGAL STANDARD

Pursuant to Rule 72(a), District Court Judges must consider timely objections to Magistrate Judges' orders that are "clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a). "The clear error standard means that the district court can overturn the magistrate judge's ruling only if the district court is left with the definite and firm conviction that a mistake has been made." *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 943 (7th Cir.1997).

Rule 702 charges trial judges with the responsibility of acting as "gatekeeper[s] with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission." *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)). "The purpose of [the *Daubert*] inquiry is to vet the proposed testimony under Rule 702's requirements that it be 'based on sufficient facts or data,' use 'reliable principles and methods,' and 'reliably appl[y] the principles and methods to the facts of the case.'" *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 809 (7th Cir. 2012) (quoting Fed. R. Evid. 702). The Magistrate Judge's recommendation barring Dr. Mathis from testifying as to Mr. Johnson's cause of death and Mr. Johnson's medical condition was erroneous because he meets the requirements to offer such testimony under *Daubert*. Moreover, it was erroneous to recommend Nurse Moore be allowed to offer standard of care opinions against Dr. Williamson, a physician. Finally, the recommendation to bar Nurse Nally from testifying regarding the significance of Mr. Jonson's pupillary dilation was erroneous.

5

**ARGUMENT**

I.  **Dr. Mathis should be permitted to render an opinion as to the cause of death.**

It is Dr. Mathis' opinion that Mr. Johnson died from methadone toxicity. (Dkt. 216-2 at 21). The Magistrate Judge recommended that Dr. Mathis be barred from testifying as to Mr. Johnson's cause of death, (Dkt. No. 238, pp. 12-14), finding it was insufficient for Dr. Mathis to merely rely upon the Medical Examiner's Report, the toxicology report, and his own independent medical research. (*Id*., p. 14). However, Dr. Mathis's consideration of the Medical Examiner's report, medical records, and medical literature, combined with his professional experience, provided a sufficient foundation to support his conclusion. (Dkt. 216-3 at 21). The Seventh Circuit has held that a doctor arriving at his conclusions based on autopsy report, medical records, and testimony of witnesses is reliable methodology. *Gayton v. McCoy*, 593 F.3d 610, 618 (7th Cir. 2010).

Dr. Mathis' qualifications and methodology extend beyond simply parroting the Medical Examiner's Report. Dr. Mathis focuses his work as a physician in the correctional system. Throughout his career, Dr. Mathis has treated and diagnosed patients in the correctional setting with mental health issues, heroin and cocaine abuse, methadone treatment, and overdoses. (Dkt. 216-2 at 7). In addition, Dr. Mathis testified he has received frequent continuing education on toxicology and its relationship to the inmates that he sees, and pathology as it relates to the patients he sees. (Dkt. 216-3 at 4).

Dr. Mathis specifically testified regarding his experience in treating and observing patients suffering from Methadone withdrawal:

> Q: Have you ever treated a Methadone withdrawal?
>
> A: Yes.
>
> Q: How many times?

6

> A: Twenty, thirty, forty. I mean, I've been in practice for a long time, and we see withdrawal from heroin or narcotics not uncommonly.

(Dkt. 216-3 at 7).

The Magistrate Judge suggested Dr. Mathis' testimony would do nothing to assist the jury to determine the cause of death or "explain anything in the medical examiner's report." (Dkt. No. 238, p. 14). To the contrary, Dr. Mathis' testimony will aid the jury in understanding the presentation of Methadone toxicity versus withdrawal in a patient (a key issue in this case). For example, Dr. Mathis explained Mr. Johnson displayed signs and symptoms of a Methadone overdose in the records, including that he appeared dope sick and was laying in bed all the time.

Dr. Mathis also explained how Mr. Johnson's symptoms were consistent with an overdose, and there was no evidence of any withdrawal:

> He was in the fetal position. He didn't move around, and that is not compatible with benzodiazepine withdrawal that your expert expounded so eloquently about, nor Methadone withdrawal. He wasn't anxious. He wasn't up and about. He didn't have diarrhea. He wasn't incontinent. He wasn't vomiting.

Dr. Mathis Dep, (Dkt. 216-3 at 21-22). This testimony will directly refute the opinion offered by the plaintiff's expert that Mr. Johnson was suffering from withdrawal at Cook County Jail. Dr. Mathis will further inform the jury as to the toxic levels of Methadone that can result in death, as was the case here. Dr. Mathis will do more than "parrot" the Medical Examiner's Report because he will explain the findings of that Report in the context of the medical records from the facility, which reflect Mr. Johnson's signs and symptoms of overdose while in Cook County Jail. This testimony, which extends beyond the Medical Examiner's Report and anticipated testimony, clearly will assist the jury's understanding of the medical issues as framed by plaintiff's expert. The *Gayton* court found it sufficiently reliable for a physician to review the record and form a differential diagnosis based on the patient's medical history and the facts surrounding her

incarceration. *Gayton,* 593 F.3d at 618. The same reasoning should be applicable to Dr. Mathis in this case.

Dr. Mathis' opinion on cause of death satisfies the requirements under *Daubert* and should not be barred. He has experience in treating and managing patients on Methadone. His methodology was proper, as he relied upon the records (including but not limited to the Medical Examiner's Report), medical research,[3] and his education, training and experience. The Magistrate Judge's recommendation to bar this opinion was erroneous and should be overturned.

**II.     Dr. Mathis is qualified to render an opinion regarding Mr. Johnson's medical condition while at Cook County Jail.**

In his Report, Dr. Mathis opined Mr. Johnson suffered from an overdose of drugs while at Cook County Jail. (Dkt. 216-2 p. 21). This opinion is based on his review of the records and his education, experience, and training. Rather than independently consider that opinion, the Magistrate Judge's recommendation that it be barred was lumped together with a ruling on other opinions related to whether Mr. Johnson obtained contraband drugs while at Cook County Jail.[4]

The ruling at issue in this objection was part of the recommendation wherein the Magistrate Judge barred Dr. Mathis' opinions regarding Mr. Johnson's use of contraband narcotics obtained in Cook County. The Magistrate Judge found:

> Dr. Mathis's opinion that Johnson obtained contraband methadone is based on speculation, and is not based on sufficient facts or data or reliable principles and methods. "The whole point of *Daubert* is that experts can't 'speculate.' They need analytically sound bases for their opinions." *DePaepe v. General Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998). "To satisfy the requirements of Rule 702 and *Daubert*, the expert need[s] to show that his conclusions were the fruit of a rigorous, objectively-verifiable approach – something more than mere speculation." *Timmy v. Goodyear Dunlop Tires of North Am., Ltd.*, 932 F.3d 986, 994 (7th Cir. 2019).

---

[3] Plaintiff's expert, Dr. Madill, never even bothered to research toxic levels at his deposition. (*See* Dr. Madill Deposition, Dkt. 219-4 at 10).

[4] The Court recommended that the following sections of the Opinion Section of Dr. Mathis's report be barred: §§4.a.iii, 4.b.1-3; 4.c.i.2, 4.d.i-iv.

8

Dkt. No. 238, p. 15.

Of significance, the Magistrate Judge's order does not appear to address Dr. Mathis' specific opinion that Mr. Johnson's symptoms were consistent with an overdose, rather than withdrawal. To reiterate an important point, Dr. Mathis' opinion regarding presentation of overdose symptoms is separate and distinct from the opinion Mr. Johnson used contraband drugs at the jail. Regardless of *how* Mr. Johnson may have been suffering from an overdose during his custody at Cook County Jail, Dr. Mathis is qualified to testify regarding Mr. Johnson's symptoms and likely causes based on Dr. Mathis' training and experience.

To be clear, Defendants are specifically objecting to the Magistrate Judge's recommendation to bar Dr. Mathis from offering opinions on Mr. Johnson's medical condition while at Cook County Jail. Dr. Mathis is qualified to render an opinion as to Mr. Johnson's likely cause of his symptoms described in the medical records. Dr. Mathis is a full-time physician and surgeon in the 2,500 inmate California Medical Facility. (Dkt. 216-1 at 1). Dr. Mathis is a Certified Correctional Health Professional-Physician. *(Id.)*. He is board certified in Family Medicine. *(Id.)* Dr. Mathis has over 20 years of experience in correctional facilities as both a provider and medical director. (Dkt. 216-1 and 216-2 at 3) Dr. Mathis served as the Medical Director at Eastern Correctional Institute in Maryland from December 2006 to November 2010. (Dkt. 216-1 at 1). During this time, he represented the medical staff in administrative discussions about correctional medical policies and procedures, and participated in monthly meetings regarding policies, procedures, quality improvement, cost containment, pharmacy formulary considerations, and a multitude of other inmate care issues. (Dkt. 216-2 at 4). Throughout his career, Dr. Mathis has treated and diagnosed patients with mental health issues, heroin and cocaine abuse, methadone treatment, and overdoses in the correctional setting. *(Id.*, p. 7). In addition, as discussed in Section

I, Dr. Mathis testified that he has treated numerous patients who have suffered from methadone withdrawal. (Dkt. 216-3 at 7). Dr. Mathis clearly is clearly qualified to render an opinion regarding Mr. Johnson's medical condition.

Moreover, Dr. Mathis' opinion regarding Mr. Johnson's symptoms and medical condition at Cook County Jail is not speculative. Dr. Mathis explained that he based this opinion on his review of Mr. Johnson's records. In particular, Dr. Mathis opined Mr. Johnson was not suffering from a withdrawal of medications because there was no history of sweating, nausea, vomiting, or diarrhea after he entered Cook County Jail. (Dkt. 216-2 at 24). Moreover, there was no record of Mr. Johnson having a history of pain or suffering while at Cook County Jail. *Id.* Dr. Mathis further explained the bases for his conclusion that there were symptoms of Methadone overdose in the medical records, such as Mr. Johnson laying in the fetal position and not moving around. (Dkt. 216-3 at 21).

Finally, Dr. Mathis relied upon the objective data in the Medical Examiner's Report, which revealed Mr. Johnson had the following drugs in his system at the time of death: benzodiazepines, cocaine metabolite benzoylecognine, and methadone. (Dkt. 219-1 at 7-8.) It is not speculation for Dr. Mathis to opine Mr. Johnson had those drugs in his system. Moreover, the medical records are clear Mr. Johnson was not administered any of those drugs while incarcerated at Cook County Jail. At the very least, Dr. Mathis should be able to testify as to the drugs found in Mr. Johnson's toxicology report, and further testify as to which drugs Mr. Johnson was prescribed and/or administered by Cook County medical staff.

Dr. Mathis' proffered opinions discussed above satisfy the requirements of *Daubert*. His approach was an objective review of the records, focusing on Mr. Johnson's actions and his symptoms while at Cook County Jail. His conclusion that Mr. Johnson suffered from an overdose,

10

rather than a withdrawal, was not based on speculation. Instead, it was based on thorough review of all the records in this case, and his education, training and experience in treating patients who have experienced symptoms of withdrawal and overdose. Dr. Mathis should be permitted to opine on Mr. Johnson's medical condition while at Cook County Jail, including his symptoms and signs of an overdose.

### III. Nurse Moore should be barred from testifying against the standard of care for Dr. Williamson.

Jacqueline Moore, a nurse, offered numerous standard of care opinions against Dr. Williamson, a physician. First, in Nurse Moore's report, she suggests Dr. Williamson failed to the follow the policies of Cermak Health System. (Dkt. 219-8 at 7). She also alleges Dr. Williamson failed to follow policy to ensure Mr. Johnson received Xanax at CCJ. (*Id*). She further opines Dr. Williamson failed to order the proper medication for Mr. Johnson while he was at CCJ. (Dkt. 219-3 at 6-8). Nurse Moore is also critical of Dr. Williamson's order for the medications to be administered as necessary. Although the Magistrate Judge found that Nurse Moore was qualified to testify against Dr. Williamson because she has the experience, skill, and knowledge to understand and articulate the relevant standards of care for various roles in a correctional medical setting (Dkt. No 238, pp. 25-26),[5] that determination was erroneous and should be overturned.

When assessing an expert's qualifications, the Court asks "not whether an expert is qualified in general but whether [s]he is qualified to answer a specific question." *United States v. Truitt*, 938 F.3d 885, 889 (7th Cir. 2019). In *Weaver v. Martija*, the Court concluded a nursing expert was not qualified to opine on how the doctors should have treated plaintiff's finger or the impact of any delay in treating his finger, as she does not have experience with such

---

[5] The Magistrate Judge further stated Defendants failed to provide any federal case to support their position that Nurse Moore is not qualified. *Id.* at p. 26.

11

injuries. *Weaver v. Martija*, No. 16 C 9400, 2020 WL 1304873, at *6 (N.D. Ill. Mar. 19, 2020) (Kendall, J.) (*See also Hamilton v. Pike Cty., Ky.*, No. CIV. 11-99-ART, 2012 WL 6570508, at *4 (E.D. Ky. Dec. 17, 2012) (striking a nurse as an expert because, among other reasons, it was "not established that she has experience, remote or recent, diagnosing these specific illnesses").

Similarly in this case, Nurse Moore lacks the experience and education to render medical opinions that are critical of a physician. Nurse Moore admitted she is not a licensed physician. (Dkt. 219-3 at 4). In fact, Nurse Moore acknowledged, "I can't speak to the standard of care for a physician." (*Id.* at p. 8). This admission alone provides a sufficient basis to bar Nurse Moore's opinions critical of Dr. Williamson.

By way of example, Nurse Moore self-admittedly lacks the qualifications to render an opinion regarding Dr. Williamson's medical orders. Nurse Moore acknowledged she cannot prescribe medications herself (*Id.* at p. 7), and she is not familiar with the medical judgments of a physician who prescribes medication. When asked to explain her opinion as to why Dr. Williamson ordered the wrong medications, Nurse Moore stated "Well, I think you should use that question with a doctor that you're going to be deposing **since I don't order those drugs."** (Dkt. 219-3 at 6) (emphasis added). Despite these concessions, Moore nevertheless criticized the medications that Dr. Williamson ordered based on "what I see used in practice." (*Id.* at p. 7). Following Nurse Moore's logic, a surgical nurse would be able to offer opinions against a surgeon on issues involving medical judgment because she has observed surgeons perform surgeries. Such an absurd result would be contrary to the law and create an entirely new (and dangerous) standard for medical opinions.

Nurse Moore's opinions against Dr. Williamson relate directly to Dr. Williamson's role as a physician and the medical judgments she used in her position as an emergency room physician.

12

Nurse Moore lacks the experience, training and education to render opinions against an emergency room physician. She should be barred from rendering any opinions against Dr. Williamson.

### IV. Nurse Nally should be permitted to opine on the significance of the lack of pupillary dilation in Mr. Johnson.

The Magistrate Judge's recommendation granted Plaintiff's challenge to Nurse Nally's ability to opine on the significance of the pupillary dilation findings of the emergency personnel responding to Plaintiff's decedent. Defendant, Nurse Cade, objects to this ruling because it improperly prevents Defendant Cade from accurately defending the allegations against her insofar as those allegations claim that she should have initiated C.P.R. on Plaintiff's Decedent ("Mr. Johnson") at an earlier point in time. Furthermore, that opinion is properly within Nurse Nally's area of expertise, and is otherwise compliant with both Rule F.R.E. 702 and *Daubert*. For the reasons set forth below, as well as those set forth within Defendant Nurse Cade's Response to Plaintiff's Daubert motion, which is fully incorporated herein, Nurse Nally should be permitted to offer the subject opinion at trial.

Nurse Nally disclosed her opinion that "[c]onstricted pupils would not have been present had Mr. Johnson laid unattended in arrest for an extended length of time," and that "[p]upil constriction supports records that indicate that Mr. Johnson arrested about the time Nurse Cade returned and EMTs responded." This opinion is not only vital to the proper defense of Nurse Cade, it is also in compliance with the demands of both F.R.E. 702 and the *Daubert* standard for the following reasons. The Magistrate Judge based her subject ruling primarily on the following deposition exchange between Plaintiff's Counsel and Nurse Nally:

> Q: Wouldn't you agree that the issue of pupil constriction *and death* is outside your area of expertise?
>
> A: Oh, absolutely, sir. That's why I did the research.

13

Dkt. No. 216-12 at 32. (emphasis added).

Notably, the significance of Nurse Nally's opinion as to the pupillary dilation issue does not relate to the relationship between pupil dilation *and death*, but between the issue of pupil dilation and the presentation of symptoms one would expect to find with a patient who is in arrest, and pulseless, as opposed to with pulse. Nurse Cade testified she encountered Mr. Johnson, evaluated him, and found the presence of a pulse. Nurse Nally has opined that the nursing standard of care does not indicate starting chest compressions, as Plaintiff alleges Nurse Cade should have done upon her arrival, when a pulse is present. She explained this position at her deposition. (Dkt. No. 216-12 at 23).

The mere fact that Nurse Nally relied upon literature to further solidify her position does not detract from its compliance with *Daubert*. To satisfy the requirements of *Daubert and* Rule 702, the proponent must show the opinions are a result of an objectively verifiable approach, and not mere speculation. *See Timmy v. Goodyear Dunlop Tires of North Am., Ltd*. 932 F.3d 986,994 (7th Cir. 2019). Here, Nurse Nally's experience consists of working as a registered nurse for more than 40 years and the knowledge she gained during that time with regard to the indications to be gleaned from a evaluating a patient's pupillary response. This included extensive emergency room work. The relevance of the pupil dilation issue is in assisting the jury in deciding whether, or not, Mr. Johnson had exhibited a pulse, as Nurse Cade testified to, or whether he did not, at the time Nurse Cade encountered him. The relevance does not pertain to any relationship between pupil dilation and death itself. The subject opinion on the condition of Mr. Johnson's pupils supports her conclusion that because Mr. Johnson's pupils were not fixed and dilated when the EMTs arrived, he had not been in a condition of cardiac arrest for an extended length of time and in fact arrested about the time Nurse Cade returned and EMTs responded, not sooner.

Nurse Nally should be permitted to testify as to her opinion on the significance of pupillary findings because the opinion is consistent with both *Daubert* and F.R.E. 702.

## CONCLUSION

WHEREFORE, Defendants respectfully request that this Court sustain Defendants' objections to the specified portions of the Magistrate Judge's recommendations, and enter an order as follows:

- Dr. Mathis is permitted to testify as to the cause of death.

- Dr. Mathis is permitted to render an opinion regarding Mr. Johnson's medical condition while at Cook County Jail, including but not limited to his overdose symptoms and medications found on his toxicology report.

- Nurse Moore is barred from testifying against the standard of care for Dr. Williamson.

- Nurse Nally should be permitted to opine on the significance of the lack of pupillary dilation in Mr. Johnson.

Dated: January 14, 2021

By: /s/ Katherine C. Morrison
One of the Attorneys for
Cook County Defendants

Terrence M. Burns
Elizabeth A. Ekl
Paul A. Michalik
Katherine C. Morrison
Reiter Burns LLP
311 S. Wacker Dr., Suite 5200
Chicago, IL 60606
312-982-0090

Respectfully submitted,

By: /s/ John C. Coyne
One of the Attorneys for Defendant
Nurse Uveeda Cade

John C. Coyne
Law Offices of John C. Coyne
53 West Jackson Blvd
Suite 1750
Chicago, IL 60604
312-583-9500

By: /s/ Patrick D. Morris
One of the Attorneys for Defendant
Andrew J. Crowley

Lyle Kevin Henretty
Patrick D. Morris
Cook County State's Attorney's Office
69 West Washington St., Suite 2030
Chicago, IL 60606
(312) 603-5500

15

**CERTIFICATE OF SERVICE**

    I, Katherine C. Morrison, an attorney, hereby certify that, on January 14, 2021, I served the foregoing *Defendants' Rule 72 Objections to Certain Portions of the Order on Parties' Daubert Motions* on all counsel of record via the Court's (ECF) electronic filing service.

                                                                                     /s/ Katherine C. Morrison