**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MARILYN JOHNSON, individually and as** | ) | |
| **Administrator of the Estate of NORMAN** | ) | |
| **JOHNSON, deceased,** | ) | |
| | ) | **Case No. 16 C 144** |
| **Plaintiff,** | ) | |
| **v.** | ) | **Judge Robert W. Gettleman** |
| | ) | |
| **Cook County Sheriff THOMAS DART,** | ) | **Magistrate Judge Susan Cox** |
| **in his Official Capacity, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - FILED UNDER SEAL PURSUANT TO DOC. 125

Plaintiff, MARILYN JOHNSON, individually and as Administrator of the Estate of

NORMAN JOHNSON, deceased, submits the following memorandum of law in support of her

motion for partial summary judgment in favor of plaintiff and against defendants COOK

COUNTY, Cook County Sheriff THOMAS DART, in his Official Capacity, Lt. SERGIO

NAVARETTE, Officer WALTER LEWIS, Nurse UVEEDA CADE, Nurse MARKITHA

BOLDEN, Doctor SUNITA WILLIAMSON, Chief Psychologist KENYA KEY, PSYD, Mental

Health Specialist VENTSISLAVA VALCHANSKI, and Pharmacist OLUFEMI AJALA, on

liability only, on Counts I, II, and III of her Second Amended Complaint.

By this motion, plaintiff is not waiving her claims against the remaining defendants.

Plaintiff believes a legitimate dispute of facts may exist involving those defendants.

## INTRODUCTION

Plaintiff's Statement of Undisputed Material Facts, Local Rule 56.1(a)(3) (PSOF) is filed separately. To avoid repetition, the detailed facts contained therein are incorporated by reference as if fully set forth herein.

Cook County Jail is a dangerous place. It temporarily houses thousands of human beings who have had an encounter with the law and are awaiting trial, some for serious alleged crimes, others, like Norman Johnson, for the most minor of offenses. Many of the detainees come to Cook County Jail with serious psychological issues.

Norman Johnson did not survive 72 hours in the jail run by Cook County Sheriff Tom Dart. But Norman Johnson did not die by his own hand or by the hands of another inmate. He died because, on the way in, he was not provided with the prescribed methadone and Xanax that he needed to survive, and, at the end, when he stopped breathing, he was not provided with the Cardiopulmonary Resuscitation (CPR) that would have afforded him his last chance to survive. He died because of the utter disregard for human life by twelve known employees of Cook County Jail. Plaintiff is seeking summary judgment against eight of those employees, those for whom there is no dispute of fact, as well as against Cook County and Sheriff Thomas Dart on a *Monell* claim.

The Butcher, the Baker, the Candlestick Maker is a well-known nursery rhyme, first published at the end of the 18th Century. Little known, just beneath the surface, the story carries a moral judgment of social disapprobation of the collective actions of the common tradesmen of the time. Norman Johnson's story is also the story of collective malfeasance, of every one of the employees of Cook County Jail that had a hand in Johnson's care during his short and fatal stay

at Cook County Jail: the nurses, the physician, the psychologist, the pharmacist, the mental health specialist, and the correctional officers and supervisor. Every single named defendant in this case had the knowledge, ability, and opportunity to save Norman Johnson's life and failed. Moreover, there was a systemic failure. The policies, procedures, and practices of Cook County and Sheriff Dart were the moving force behind the constitutional violation of the individuals.

In 2008, after an investigation of conditions at Cook County Jail related to inmate medical and mental health care, the United States Department of Justice (DOJ) issued a 98-page report finding that certain conditions at the Jail violated the constitutional rights of inmates and that inadequate medical care had caused multiple preventable inmate deaths. PSOF 51. The DOJ Report found, among numerous constitutional deficiencies, that "grossly inadequate" intake medical and mental health screening of new detainees had resulted in unnecessary deaths and suffering due to opiate and psychotropic drug withdrawal. PSOF 52, 53. The DOJ Report found that no psychiatrists with prescribing authority were assigned to the intake mental health screening process, resulting in failure to provide inmates with critical medications without delay. PSOF 56, 58. The DOJ Report found that Cook County Jail failed to conduct self-critical mortality reviews with respect to inmates who died in custody. PSOF 57.

As a result of the 2008 DOJ Report, Cook County Jail underwent periodic monitoring through June 2018. PSOF 60. For Norman Johnson, who died right in the middle of that ten-year period, it was almost as if the DOJ investigation had never even occurred. At Cook County Jail, he was abruptly cut off from his prescriptions for both methadone and the psychotropic medication Xanax, putting him at risk for life-threatening seizures, as well as agonizing and unnecessary suffering. PSOF 26, 27, 30. He never even received any of the medications that

3

were prescribed in jail to alleviate that suffering. PSOF 33. He was denied the recommended medical housing where his rapidly progressing withdrawal symptoms could be monitored. PSOF 41. His pleas for help were ignored by every guard. PSOF 45.

At the end, both medical and correctional employees denied Norman Johnson's final chance of survival. One nurse and two correctional officers stood over Johnson, who had stopped breathing, for more than 30 minutes, and refused to initiate the life-saving act of CPR. PSOF 86, 100. Despite awareness of the medical emergency, the Shift Commander did not bother to bring the only available defibrillator up one flight of stairs to Norman Johnson's bunk until Johnson was almost certainly brain dead from oxygen deprivation. PSOF 102, 103. ███

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████

## FACTUAL BACKGROUND

Norman Johnson was not a career criminal. Not even close. He had only two arrests for minor drug possession charges in the ten years before his death. PSOF 11. Before that, following graduation from high school, he had attended Malcolm X College for two years. He then worked for the City of Chicago as an operating engineer in the Water Department, retiring in 1998 and buying a house for himself and his wife with his retirement funds. PSOF 5.

At some point after that, Norman Johnson is not here to tell us exactly when, his life began to go off the rails. What we do know is that, in approximately 2005, he began daily participation in a methadone maintenance program that was offered in his community to those individuals that wanted to stay off of harder and illegal drugs. PSOF 18. In 2010 and 2011,

Norman Johnson was hit with the death of his mother and son in rapid succession. In 2012, the daughter to whom he was closest in life, was murdered at the hands of her own husband. PSOF 6. After that, between December 2012, and October 2013, Norman Johnson admitted himself to nearby Westlake Hospital on three separate occasions when he recognized that he was psychologically unravelling and needed professional help. PSOF 7.

### Arrest and Booking

Friday, January 3, 2014, began for Norman Johnson like every day for the past nine years. At 6:28 a.m., he stood in line at the methadone clinic located at the gritty corner of Ashland Avenue and Lake Street under the Green Line elevated tracks in Chicago, waiting to receive what would prove to be his last dose of methadone ever. PSOF 8. A little over five hours later, Norman Johnson was arrested at another Chicago corner in his own neighborhood. A Chicago Police Officer alleged that he had witnessed Norman Johnson buying $10.00 worth of a "suspect" controlled substance. PSOF 9. There is nothing in the Police Report about a drug dealer being arrested as well. Unable to make his $10,000 bail, Norman Johnson was booked into Cook County Jail at 3:12 p.m. on Saturday, January 4, 2014. PSOF 10.

### Medical Health Intake Screening

Shortly after midnight in the early morning hours of Sunday, January 5, 2014, undoubtedly exhausted, fearful and sleep-deprived after being locked up for two nights, Norman Johnson underwent the medical health intake screening that was required of all new pretrial detainees. PSOF 14. Dr. Jack Raba, the former head of Cook County Jail's Cermak Health Services, once said that the mental and medical intake screening was the single most important health care function provided by Cermak staff. PSOF 13. Three intake screeners, a nurse (Kim

Blackstone, RN), a paramedic (Andrew Crowley), and a physician (Dr. Sunita Williamson), each spent a few minutes interviewing and examining Johnson during medical health intake screening. PSOF 14.

Norman Johnson told each of the intake screeners that the medications he was taking before his arrest included methadone, which he had received daily for nine years through a methadone treatment program. He also told the screeners that he had received his last dose of methadone two days earlier and that he was suffering from the methadone withdrawal symptoms of nausea, vomiting, and diarrhea. PSOF 16, 17. Although the physician intake screener, Dr. Williamson, diagnosed Johnson as methadone dependent and knew that he was about to get "very sick, very soon," from methadone withdrawal, she did not take the most basic step necessary to ensure that her patient would continue to receive methadone during his time at Cook County Jail. PSOF 18.

The procedure for a new detainee to begin to receive methadone at Cook County Jail is governed by Cermak Policy G-06.1, "Opioid Treatment Program." That policy provides that it is the responsibility of any "intake screener" to provide a Methadone Referral Card (MRC) and accompanying authorization forms to any new detainee who reported participation in an opioid treatment program outside of jail. PSOF 21. Pursuant to the same policy, the pharmacy would then pick up the cards and, by means of a simple telephone call to the outside program identified by the detainee, verify his participation and methadone dosage. If that MRC is not filled out, a new detainee will never receive methadone during his time at Cook County Jail. PSOF 22. Of significance, a virtually identical methadone maintenance process at Cook County Jail was found in 2006 to suffer from a lack of "checks-and-balances system to make sure that patients who

suffer from methadone withdrawal . . . do not fall through the cracks for several days (or more)." *Davis v. Carter,* 452 F.3d 686, 692 (7th Cir. 2006).

Intake screeners Paramedic Crowley and Dr. Williamson admit that they did not provide Norman Johnson with an MRC. PSOF 23. Nurse Blackstone did not recall her encounter with Mr. Johnson and therefore could not remember if she gave him an MRC, but testified that she was so good at her job that she *must have* given him one. PSOF 24. However, there is no MRC in Johnson's entire medical chart, and the accompanying authorization forms requiring Johnson's signature are not in the chart either. PSOF 25. Most tellingly, Johnson never received any prescribed methadone at all during his time he was incarcerated at Cook County Jail. PSOF 26. When testimony such as that of Nurse Blackstone is "blatantly contradicted" by evidence of record, the Court should not give any credit to that witness' version of events. *See, Dockery v. Blackburn,* 911 F.3d 458, 461, 465 (7th Cir. 2018), citing *Scott v. Harris,* 550 U.S. 372, 380 (2007).

At the conclusion of the medical portion of Norman Johnson's intake screening, Dr. Williamson prescribed prochlorperazine (Compazine) every 12 hours as needed (PRN) for vomiting, and nausea, and loperamide PRN every 6 hours for diarrhea. These medications were intended to prevent dehydration during withdrawal, which could lead to much more serious medical issues, including heart arrythmias. PSOF 28. Dr. Williamson also recommended that Johnson be housed on a medical floor so that his soon to be deteriorating medical condition could be reassessed at least every four hours. PSOF 40. Notably as well, Dr. Williamson completely failed to even consider the effects of abrupt cessation of Xanax or the potential severity of concomitant withdrawal from both opiates and benzodiazepines. PSOF 37.

**Mental Health Intake Screening**

On January 5, 2014, at 6:33 a.m. (Sunday), approximately four hours after Dr. Williamson completed her medical intake screening, Cermak Health Services' employee and Mental Health Specialist (MHS) Ventsislava Valchanski (now Christoff) conducted the Mental Health Intake Screening process for Norman Johnson. PSOF 71. Johnson told MHS Valchanski that he had been hospitalized three times for psychiatric issues, that he was seeing a psychiatrist on the outside, that he had a history of recent mental health treatment, and that he was currently suffering from symptoms related to depression/mania and anxiety/psychosis. PSOF 72. Norman Johnson also told MHS Valchanski "I need my meds," which Valchanski understood to mean his 2 mg. daily prescription for the psychotropic drug Xanax, which he had been taking before his arrest. PSOF 73.

In spite of his history, MHS Valchanski did not refer Norman Johnson for immediate psychiatric evaluation, but rather classified Johnson as only in need of an outpatient level of care. She then entered a "Routine" Order referring Johnson to be seen by a psychiatrist within two weeks. PSOF 74, 75. The "Ordering Physician" for that referral to psychiatry was identified in Norman Johnson's medical records as Kenya D. Key, PSYD, Cermak Health Services' Chief of Psychology, even though Dr. Key never met nor examined Norman Johnson and was not directly involved in his care. Dr. Key testified that there was a practice in January 2014 of allowing her subordinates to sign her name, even without her knowledge, on psychiatry referral orders, ostensibly in order to fake compliance with the Illinois Nurse's Act and the Illinois Mental Health Code. PSOF 77-80.

8

The previously mentioned 2008 DOJ Report found that "the policy governing the CCJ mental health screening process is completely inadequate" and "did not comport with generally accepted correctional standards of care" in that the "screening is not accomplished under appropriate medical supervision" with "no psychiatrists . . . assigned to supervise or support the . . . intake area where the initial mental health screening is conducted," [as necessary for] "identification of emergent mental health care needs." PSOF 58. Under an Agreed Order entered in response to the DOJ investigation, Cook County Jail stipulated that, within 24 hours of a new detainee's booking, a Qualified Medical or Mental Health Professional with prescribing authority was to evaluate the new detainee's need for any medications reported as having been prescribed before his arrest. PSOF 61. Norman Johnson's 24-hour clock ended on January 5, 2014, at 3:12 p.m. (Sunday), two days before he died. PSOF 10.

As early as 1983, the Seventh Circuit had recognized that, because "treatment of the mental disorders of mentally disturbed inmates is a serious health need," the lack of an on-site psychiatrist would be a prison's "most obvious serious deficiency in health care." The basis for this ruling was that "without an on-site psychiatrist there is no one qualified to evaluate and treat . . . patients who need to be maintained on long term psychotropic medications." *Wellman v. Faulkner,* 715 F.2d 269, 272 (7th Cir. 1983). Then again, in *Woodward v. Correctional Medical Services of Illinois,* the Seventh Circuit issued another reminder of its criticism of delays in arranging for new detainees to see a psychiatrist. In this case, not only is Dr. Key a psychologist, not a psychiatrist with prescribing authority, she also never personally examined Norman Johnson.

9

**Fifty-Two Hours**

Despite Dr. Williamson's explicit direction, Norman Johnson was not assigned to a medical floor, but rather to a general population dormitory, where nurses dispensed medication from the doorway, not venturing inside, and, according to fellow inmates, the guards ignored the fact that Johnson was bedridden 90% of the time and ignored Johnson's pleas for medical assistance. Furthermore, Norman Johnson's medical chart is completely devoid of any evidence that Johnson ever received the prescribed PRN medications or was evaluated for their need. His Medication Administration Records (MARS), contained in his medical chart, are completely blank, except for his name and the names of his prescribed drugs. PSOF 33, 40-45.

For the fifty-two hours that Norman Johnson had left to live after completion of his intake screening, based on his medical chart and apart from the medical emergency he experienced at the end of his life, Johnson never saw one doctor. Johnson never saw one psychiatrist. And Johnson saw only one nurse. PSOF 46. That nurse was Nurse Markitha Bolden, whom he saw on January 6, 2014, at 1:25 p.m. (Monday), in the infirmary one floor below Norman Johnson's dormitory. PSOF 46, 47. Although Johnson went to the infirmary to inquire about his methadone, all Nurse Bolden did was record Johnson's vital signs, without any further assessments or documentation of the reason for Johnson's visit. PSOF 47-49.

**Twenty-Six Minutes**

On January 7, 2014, at 10:09 a.m. (Tuesday), correctional officers were notified that an inmate in Norman Johnson's dormitory was having a seizure. PSOF 83. Moments thereafter, Officer Walter Lewis was the first to arrive on the scene. Although no one knew his name, Norman Johnson was no longer exhibiting any seizure-like activity. He was lying in his bed

10

completely motionless. He was not breathing. He had no pulse. Although Officer Lewis received annual training in CPR and was with Norman Johnson continuously until the paramedics arrived at twenty-six minutes later, at 10:35 a.m., Officer Lewis never initiated CPR. PSOF 84, 86. In fact, Officer Lewis was heard by inmates in adjacent bunks to utter the racial epithet "N*****" and exclaim that he would only give CPR to a woman or a child. PSOF 85.

At 10:10 a.m., Nurse Uveeda Cade, who was in the Nursing Station on the same floor as Norman Johnson, was notified of the need for medical assistance in an emergency. PSOF 83. By the estimation of Officer Lewis, Nurse Cade arrived two minutes after him. PSOF 89, 90. Nurse Cade also checked Johnson's pulse, then left the dormitory to retrieve her stethoscope. When she returned 30 seconds later and checked his pulse again, Nurse Cade agreed that Johnson had no pulse or heartbeat. PSOF 90. Nevertheless, Nurse Cade also did not start CPR, but, instead of remaining by Norman Johnson's bedside, returned to dispensing medication in an adjacent dormitory. PSOF 91. At 10:28 a.m., a concerned Officer Percy Kirkwood requested that Nurse Cade to return to the dormitory. Nurse Cade returned momentarily, but then left again to meet the paramedics as they arrived on the first floor of the dormitory, advising the paramedics that there was an inmate on the second floor without a pulse. PSOF 92, 93.

When the paramedics got to the second floor at 10:35 a.m., they determined that the still unidentified detainee had no pulse, no respirations, no blood pressure, and that no one had yet administered CPR to the patient. PSOF 99-101. The Shift Commander, Lt. Sergio Navarette, who was responsible for bringing the defibrillator located in his first floor office to the scene, arrived at the same time as the paramedics. Although Lt. Navarette had first been notified of the emergency at 10:12 a.m., he had ignored that call, continuing to do paperwork at his desk. PSOF

11

102-104.  By the time Lt. Navarette did arrive, the paramedics had taken over, directing resuscitation attempts, so Lt. Navarette began moving the other 44 detainees to the downstairs recreation room. PSOF 42, 105.  During this movement, fellow detainee Bryan House was stopped in the hallway by two correctional officers, one of whom was wearing a white shirt, and told that he had best keep quiet about the incident. PSOF 106.

## ARGUMENT

### Summary Judgment Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a); *see also, Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  *See, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Chelios v. Heavener,* 520 U.S. F.3d 678, 685 (7th Cir. 2008).  However, to the extent the non-movant's story is "blatantly contradicted" or "utterly discredited" by evidence of record, such that no reasonable jury could believe it, the Court does not credit the non-movant's version of events.  *Dockery v. Blackburn,* 911 F.3d 458, 461, 465 (7th Cir. 2018), citing *Scott v. Harris,* 550 U.S. 372, 380 (2007).  A Court's favor toward the non-moving party also does not extend to drawing inferences which are only supported by speculation or conjecture.  *Singer v. Raemisch,* 593 F.3d 529, 533 (7th Cir. 2010).

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial.  *Celotex,* 477 U.S. at 323.  The moving party bears the burden of persuasion on the issues and must "lay out the elements of the claim, cite the facts

which it believes satisfy these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. National Ret. Fund,* 778 F.3d 593, 601 (7th Cir. 2015). Summary judgment is the "put up or shut up" moment in a lawsuit, when a party must show what evidence it has that would convince a factfinder to accept its version of events. *Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 901 (7th Cir. 2003).

In responding to a motion for summary judgment, the non-moving party may not simply rest upon the allegations contained in the pleadings, but must present specific facts to show that a genuine issue of material fact exists. *Celotex,* 477 U.S. at 322-26; *Anderson,* 477 U.S. at 256-57. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson,* 477 U.S. at 247, or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact only exists if "a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented." *Anderson,* 477 U.S. at 252. Once the movant has shown that the facts entitle him to judgment in his favor, the burden shifts to the non-movant to identify some evidence in the record that establishes a triable factual issue. Neither speculation nor generic challenges to a witness's credibility are sufficient to satisfy this burden. *Trentadue v. Redmon,* 619 F.3d 648, 652 (7th Cir. 2010); *Michael v. St. Joseph Cty.*, 259 F.3d 842, 845 (7th Cir. 2001).

### Objectively Unreasonable Medical Care

When the government takes people into custody so that they are no longer able to take steps to protect their own health, the Eighth Amendment's prohibition on cruel and unusual

punishment requires that governments not act with deliberate indifference to serious threats to prisoners' health and safety. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). However, for people like Norman Johnson, taken into government custody against his will and held in custody prior to any conviction of the crime for which he is being held, the Due Process Clause of the Fourteenth Amendment, as opposed to the Eighth Amendment, applies and imposes a much stricter duty on government custodians of an innocent citizen, who "cannot be punished at all." *See, Miranda v. County of Lake,* 900 F.3d 335, 350, 352 (7th Cir. 2018).

A claim based on deficient medical care must demonstrate that plaintiff had a serious medical need; the defendant knew of the risk; the defendant's treatment of plaintiff's medical condition was objectively unreasonable; and there was causation. *Miranda v. County of Lake,* 900 F.3d 335, 350-54 (7th Cir. 2018); *7th Cir. Pattern Civil Jury Inst. 7.17; Parish v. Sheriff of Cook County,* 07 CV 4369, Judge Lee, 5/30/2019.

There can be little dispute that Norman Johnson suffered from several serious medical needs, including the need for the continuation of his prescribed methadone and his prescribed psychotropic medication Xanax, as well as the obvious need for prompt administration of CPR when he stopped breathing.

A serious medical condition is characterized by "the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Schneider,* 546 F.3d 516, 522-23 (7th Cir. 2008). The Seventh Circuit has recognized that a jail policy which required a forced withdrawal from methadone would violate the Fourteenth Amendment, *Foelker v. Outagamie County,* 394 F.3d 510 (7th Cir. 2005), as well

14

as that "a widespread practice or custom of inordinate delay in providing methadone treatment to inmates" is a "significant medical issue" that may cause "proximate harm." *Davis v. Carter*, 452 F.3d 686, 692 (7th Cir. 2006). The Court has likewise found that "a psychiatrist is needed to supervise long term maintenance" on psychotropic medicine. *Wellman v. Faulkner,* 715 F.2d 269, 272-73 (7th Cir. 1983).

Since the decision in *Miranda, supra,* the standard for determining whether treatment of a medical condition is objectively unreasonable is whether the medical care provided by a defendant constitutes "reckless disregard." *Miranda,* 900 F.3d at 353. Prior to *Miranda*, when the standard applied to pretrial detainees was deliberate indifference, the Seventh Circuit held that it was well settled that providing no medical care in the face of a serious health risk constituted deliberate indifference. *Ortiz v. Chicago,* 656 F.3d 523, 538 (7th Cir. 2011). The Court also equated deliberate indifference with medical treatment that was "blatantly inappropriate," *Greeno v Daley,* 414 F.3d 645, 654 (7th Cir. 2005); treatment that was "grossly incompetent, *Adams v. Poag,* 61 F.3d 1537, 1543-44 (7th Cir. 1995); and treatment that was "far afield of accepted professional standards," *Arnett v. Webster,* 658 F.3d 742, 751 (7th Cir. 2011). The Court has held that "even brief, unexplained delays in treatment may constitute deliberate indifference." *Lewis v. McLean,* 664 F.3d 556, 563-64 (7th Cir. 2017). The ultimate inquiry is "whether the conduct of each defendant was objectively reasonable under the circumstances." *Perry v. Wenzel*, 872 F.3d 439, 453-54 (7th Cir. 2017).

To satisfy the causation element of a due process claim, a plaintiff has to present "verifying medical evidence that the delay in medical care caused some degree of harm," *Miranda,* 900 F.3d at 347. The plaintiff does not "bear the burden of proving that but for the

15

medical defendants' inaction, [the plaintiff] would definitely have lived. It would have been enough for [the plaintiff] to show that the resulting harm was a diminished chance of survival." *Miranda,* 900 F.3d at 347. Although no expert testimony is necessary to avoid summary judgment on the issue of proximate cause, the testimony of a 10% to 30% survival rate has been held to be more than sufficient. *Gayton v. McCoy,* 593 F.3d 610, 624-25 (7th Cir. 2010). Where an obviously ill detainee does in fact die in custody, a jury could infer, based on medical records and witness testimony alone, that defendants caused harm. *Ortiz v. Chicago,* 656 F.3d 523, 535 (7th Cir. 2011). Even a prisoner's own allegations of pain from denial of medications, without expert evidence, is sufficient to defeat summary judgment. *Rowe v. Gibson,* 798 F.3d 622, 631 (7th Cir. 2015).

### *Monell* Liability

To establish a *Monell* claim, a plaintiff must show that he or she suffered a deprivation of a constitutional right proximately caused by either (1) an express municipal policy; (2) a widespread common practice that by virtue of its ubiquity constitutes a *de facto* custom or usage with the force of law; or (3) a deliberate act of a decision-maker with final policy-making authority. *See, Rossi v. City of Chicago,* 790 F.3d 729, 737 (7th Cir. 2015). In addition to showing that the municipality acted culpably in one of those three ways, the plaintiff must prove causation by demonstrating that the municipality "is the 'moving force' behind the deprivation of constitutional rights." *Glisson v. Ind. Dept. of Corrs.,,* 813 F.3d 662, 667 (7th Cir. 2016) (quotation omitted). *See also, 7th Cir. Pattern Jury Instrc. 7.24.*

*Monell* liability is possible even if no individual municipal employee is found to have been deliberately indifferent, and a single incident is enough for liability where a constitutional

16

violation was highly foreseeable. *Miranda,* 900 F.3d at 344. A gap in an expressed policy can result in a finding that the policy is unconstitutional. *Daniel v. Cook County,* 833 F.3d 728, 734 (7th Cir. 2016). "While it is not 'impossible' for a plaintiff to demonstrate a widespread practice or custom with evidence limited to personal experience, it is necessarily more difficult . . . because 'what is needed is evidence that there is a true municipal policy at issue, not a random event.'" *Hildreth v. Butler,* 960 F.3d 420, 426 (7th Cir. 2020) (quoting *Calhoun v. Ramsey,* 408 F.3d 375, 380 (7th Cir. 2005). Most of the cases cited in *Hildreth,* 960 F.3d at 426-27, for the proposition that individual experience is not enough involve a handful of experiences over a period of years. However, when a Department of Justice Investigation Report, which is entitled to considerable weight, is added to one individual's experiences, knowledge, and notice, there is enough evidence to get the issue of systemic problems with the health care system to the jury. *Daniel,* 833 F.3d at 735-36, 742.

Municipal liability can also result from a failure to adequately train employees in the proper handling of recurring situations that can foreseeably result in a constitutional violation. *City of Canton v Harris,* 489 U.S. 378, 388-91 (1989); *Miranda,* 900 F.3d at 345; *see also, 7th Cir. Pattern Jury Instr. 7.25.* In *Connick v. Thompson,* 131 S.Ct. 1350, 1360 (2011), the Court held that "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." (quoting *Bryan Cnty. v. Brown,* 520 U.S. at 409); *see also, 7th Cir. Pattern Jury Instr. 7.25, Committee Comment (b).*

However, a municipality does not get a free pass to cause a person's death. *See, Woodward, supra,* 368 F.3d at 929 (no "one free suicide pass"). The Supreme Court has

17

expressly acknowledged that evidence of a single violation of federal rights can trigger municipal liability if the violation was "a highly predictable consequence" of the municipality's failure to act. *Bd. Of Cty. Comm'rs of Bryan Cty. v. Brown,* 520 U.S. 397, 409 (1997). In *Woodward, supra,* at 929, *Monell* liability was affirmed based on the "flawed conduct" of a nurse, a social worker, and a physician during the mental health intake process.

### Summary Judgment Liability of Sheriff Dart and Cook County

Plaintiff's Second Amended Complaint alleges a *Monell* claim for municipal liability based on a "failure to implement an adequate policy for continuation of a community methadone program, thereby putting new detainees at risk of serious health consequences due to abrupt withdrawal from opiates." ¶ 47. The Complaint also alleges a failure to train with respect to that policy. ¶ 49. As more fully set forth above, the Methadone Referral Card is the lynch pin of Cook County Jail's methadone maintenance policy. As further set forth above, plaintiff has documented five separate instances in which five separate employees failed to insure issuance of a Methadone Referral Card over a single day. Those employees included two nurses (Blackstone and Bolden), a paramedic (Crowley), a physician (Williamson), and a mental health specialist (Valchanski). "An unconstitutional policy can include . . . a gap in expressed policies." *Daniel v. Cook County,* 833 F.3d 728, 735 (7th Cir. 2016). Furthermore, "ignoring a policy is the same as having no policy in place in the first place." *Woodward, supra,* 368 F.3d at 929.

In holding that the 2008 DOJ Report of unconstitutional conditions at Cook County Jail is admissible as a specific exception to the federal hearsay rules, the Seventh Circuit further held that "those findings . . . go a long way toward meeting a plaintiff's burden of proving an unconstitutional custom, policy, or practice under *Monell*." *Daniel, supra,* 833 F.3d at 731. The

18

Case: 1:16-cv-00144 Document #: 273 Filed: 06/04/21 Page 19 of 26 PageID #:6129

DOJ Report found that Cook County Jail frequently failed to provide critical medications to inmates without delay, including mention of a specific incident in which an inmate died within a day of booking due to opiate withdrawal syndrome.  PSOF 53, 56. ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████

    For the above reasons, plaintiff should be granted summary judgment on her *Monell* claims against Cook County and Cook County Sheriff Thomas Dart.

**Summary Judgment Liability of Officer Lewis, Nurse Cade, and Commander Navarette**

    Shift Commander Navarette, Officer Lewis, and Nurse Cade equally share in the failure to immediately initiate resuscitation attempts when Norman Johnson suffered his own "I can't breathe" moment.  Failure to initiate CPR for more than 20 minutes violated the standard of care, eliminated Johnson's only chance of survival, and was obviously "blatantly inappropriate." *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014) (citing, *Greeno v. Daley,* 414 F.3d 645, 654 (7th Cir. 2005).  PSOF 107, 108.  Nurse Cade's blithe return to distributing medication, leaving her patient without medical attention, was a deliberate delay in providing necessary medical care. *See, Ortiz v. Webster,* 655 F.3d 731, 734 (7th Cir. 2011).  No human being is allowed to "sit by and leave serious medical needs unattended."  *See, Miranda v. County of Lake,* 900 F.3d 335,353 (7th Cir. 2018).   Officer Lewis' flippant statement regarding reserving his CPR for women and children alone was "barbaric."  *See, Perry v. Wenzel,* 872 F.3d 439, 456 (7th Cir. 2017).

19

Officer Lewis offered no explanation for his conduct, other than believing that Norman Johnson was already basically dead and that a defibrillator was more important in reviving a patient in Johnson's condition than starting CPR. PSOF 87. That explanation ignores the possibility that drugs like Narcan could reverse the effects of any overdose of opiates, if that were the problem, assuming CPR had kept Johnson from becoming brain dead in the interim. PSOF 109. Shift Commander Navarette offered no explanation for his delay in bringing the only defibrillator in the compound to a medical emergency for more than 20 minutes, other than that he was busy doing paperwork. PSOF 102.

Nurse Cade's four different explanations for her conduct requires a separate examination. Her first story to the Sheriff's Investigator immediately after Norman Johnson's death, that she had found Johnson without a pulse, was changed in a Progress Note entered in Johnson's medical chart to finding Johnson "with even respirations and bilateral pulses palpable." PSOF 95, 96. ████████████████████████████████████████████████████████ ██████████████████████████████ Finally, in her deposition more than two years later, Nurse Cade simply declared that "patient was stable." PSOF 98.

"Inconsistent testimony" by a medical provider is evidence that the provider "did *not* meet the standard of care." *Gil v. Reed,* 535 F.3d 551, 558 (7th Cir. 2008). Furthermore, where a non-movant's story "blatantly contradict[s]" or "utterly discredit[s]" itself, that witness' version of events is entitled to no weight at all. *See, Dockery v. Blackburn,* 911 F.3d 458, 461, 465 (7th Cir. 2018), citing *Scott v. Harris,* 550 U.S. 372, 380 (2007). Other than Norman Johnson's fellow detainees, who told a completely different story, Officer Lewis and Nurse Cade are only two witnesses who admit to having observed Johnson's condition shortly before his death.

20

Without Nurse Cade's conjured testimony, the admissions of Officer Lewis should carry the day on plaintiff's motion for partial summary judgment against Officer Lewis, Nurse Cade, and Shift Commander Navarette.

### Summary Judgment Liability of Dr. Williamson

Dr. Sunita Williamson was the final medical intake screener to see Norman Johnson. Evidence that a plaintiff received "some medical care does not automatically defeat a claim of deliberate indifference if a fact finder could infer the treatment was so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate a medical condition." *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007). The facts, as set forth above, that Dr. Williamson failed to adhere to Cermak Health Services Policies to ensure that Norman Johnson received a Methadone Referral Card, to evaluate his need for psychotropic medication, or to assess his withdrawal symptoms in the detail and format required "showed a complete abandonment of professional judgment." *7th Cir. Pattern Jury Instruc. 7.17.* It was Dr. Williamson's responsibility under the standard of care and in the intake screening process to prescribe the Xanax that she knew he had been taking prior to his arrest. PSOF 34-36. The fact that she "did not choose" to evaluate Norman Johnson's dependence on Xanax exposed him to agonizing pain and probable death. PSOF 37-39.

These facts justify a finding for plaintiff on her motion for partial summary judgment against Dr. Williamson.

### Summary Judgment Liability of Pharmacist Ajala

A full two days before Norman Johnson's death, Pharmacist Ajala received Dr. Williamson's orders for Compazine and loperamide, medications intended to relieve the

suffering inherent in abrupt methadone cessation. Pharmacist Ajala recognized the medications as "Routine A" medications, historically used at Cermak Health Services to relieve the suffering inherent in abrupt methadone cessation. PSOF 28, 31, 32. *See, Davis v. Carter,* 452 F.3d 686, 691 (7th Cir. 2006). It was Pharmacist Ajala's responsibility to verify online prescriptions for medications, to dispense the medications ordered by the Cermak physician at intake, and to supervise the medication supply chain at Cook County Jail. PSOF 30. Norman Johnson did not receive any of the prescribed medications and was thereby exposed to unnecessary suffering and probable death. PSOF 27, 33.

It was also Pharmacist Ajala's responsibility under Cermak policies to pick up completed Methadone Referral Cards and verify the new detainee's participation in an outside methadone maintenance program. PSOF 29. Based on Pharmacist Ajala's knowledge of the purpose of Routine A, he knew that Norman Johnson was methadone dependent, yet never questioned the absence of a Methadone Referral Card in Johnson's chart, further subjecting the patient to unnecessary pain. PSOF 25-27.

These facts justify a finding for plaintiff on her motion for partial summary judgment against Pharmacist Ajala.

### Summary Judgment Liability of Nurse Bolden

Nurse Bolden was the *only* medical professional to actually see Norman Johnson between intake processing and the medical emergency preceding his death. PSOF 46. ███████████ ████████████████████████████████████████████████████████████ ██████████████████████████████ However, the only thing that Nurse Bolden did for Johnson was to take his vital signs. There is nothing in Norman Johnson's medical chart

documenting that Nurse Bolden assessed Johnson for his current withdrawal symptoms or for his need for the withdrawal relief medications prescribed by Dr. Williamson the day before.  There is likewise nothing in the chart indicating that Nurse Bolden did anything to verify the status of Johnson's Methadone Referral Card.  PSOF 49.

These facts justify a finding for plaintiff on her motion for partial summary judgment against Nurse Bolden.

### Summary Judgment Liability of Dr. Key & MHS Valchanski

During Mental Health Intake processing, Norman Johnson pleaded with MHS Valchanski, "I need my meds."  She knew that he meant his Xanax, which was being used to control the serious psychiatric issues that Johnson had divulged to MHS Valchanski.  PSOF 71-73.  Yet MHS Valchanski chose not to refer Johnson to a psychiatrist with prescribing authority for an immediate psychiatric evaluation, classifying him as only in need of an outpatient level of care.  Her choice meant that Johnson would see a psychiatrist sometime within the next two weeks.  PSOF 74-75.  Under similar circumstances, this Court (Judge Charles Kocoras) found that a social worker's conduct was objectively unreasonable and granted summary judgment in favor of the plaintiff and against the social worker.  *Johansen v. Curran,* NDIL 15 CV 2376, Feb. 22, 2019 (Doc. # 109, p. 26).

MHS Valchanski's conduct was directly enabled by her Supervisor, Dr. Kenya Key. Although she had never met nor examined Norman Johnson, Dr. Key's name appeared as the "Ordering Physician" on the "Routine" Order for referral to psychiatry within two weeks entered by MHS Valchanski  PSOF 75-78.  Dr. Key admitted that she was aware and approved of the practice at Cermak Health Services of her name being signed illegally by subordinates on

23

psychiatry referral orders in patients' medical records. PSOF 79. The purpose of the practice was to evade the legal requirements of the Illinois Nurse's Act and the Illinois Mental Health Code. PSOF 80. The practice also effectively circumvented the 2008 DOJ Report and resulting Agreed Order that a psychiatrist would be present at all mental health intake screenings in order to assure immediate continuation of psychotropic medications. PSOF 58, 59, 61, 63.

In *Gayton v. McCoy,* 593 F.3d 610, 621 (2010), the Court found that in order for a supervisor to be liable for a subordinate's conduct, "the plaintiff needs to show that they had knowledge of [plaintiff's] condition and somehow ratified the deliberate indifference of those persons who were directly responsible for [plaintiff's] care." In this case, Dr. Key's actions assured that it was unlikely that a patient such as Norman Johnson would see a psychiatrist in a timely manner. The Seventh Circuit Pattern Instruction 7.23, "Liability of Supervisor," supports a finding of supervisory liability in this case in that Dr. Key "knew that" the Officer she supervised "had a practice of" [entering medical orders without legal authority] "in similar situations." *See also, Wellman v.* Faulkner, 715 F.2d 269, 275 (7th Cir. 1983) ("The personal responsibility requirement is satisfied . . . if the conduct causing the constitutional deprivation occurs at [the supervisor's] direction or with her knowledge and consent.")

███████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████ These facts justify a finding

for plaintiff on her motion for partial summary judgment against Dr. Key and MHS Valchanski.

**CONCLUSION**

For the reasons set forth above, Plaintiff Marilyn Johnson respectfully requests that an order be entered granting summary judgement in this case against Defendants COOK COUNTY, Cook County Sheriff THOMAS DART, in his Official Capacity, Lt. SERGIO NAVARETTE, Officer WALTER LEWIS, Nurse UVEEDA CADE, Nurse MARKITHA BOLDEN, Doctor SUNITA WILLIAMSON, Chief Psychologist KENYA KEY, PSYD, Mental Health Specialist VENTSISLAVA VALCHANSKI, and Pharmacist OLUFEMI AJALA, on liability only, on Counts I, II, and III of her Second Amended Complaint.

Dated: June 1, 2021                                   /s/   James L. Bowers
                                                              James L. Bowers

## CERTIFICATE OF SERVICE

I, James L. Bowers, an attorney, certify that on June 1, 2021, a copy of PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - FILED UNDER SEAL PURSUANT TO DOC. 125 was served upon the attorneys for defendants named below through the Court's electronic filing system:

Katherine C. Morrison
Terrence M. Burns
Elizabeth E. Ekl
Paul A. Michalik
Reiter Burns LLP
311 S. Wacker Dr., Suite 5200
Chicago, IL 60606

Patrick D. Morris
Lyle K. Henretty
Cook County State's Attorney's Office
69 W. Washington St., Suite 2030
Chicago, IL 6060

John C. Coyne
Law Offices of John C. Coyne
53 W. Jackson, Suite 1750
Chicago, IL 60604

Dated: June 1, 2021

      /s/   James L. Bowers
              James L. Bowers

26